| JANE DOE, et al | * | NO. 6:21-cv-00430-DCJ-CBW |
| vs. | * | JUDGE DAVID C. JOSEPH |
| EDOUARD d'ESPALUNGUE d'ARROS | * | MAGISTRATE JUDGE CAROL B. WHITEHURST |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND RECOMMENDED JUDGMENT SUBMITTED BY PLAINTIFFS

Plaintiffs submit the following proposed findings of fact, conclusions of law, and recommended Judgment in connection with the captioned matter.

## INTRODUCTION

This is a diversity case based upon Louisiana tort law. Plaintiffs A.S. ("Jane Doe") and her parents, J.S. and D.S. ("John and Mary Doe"), are all residents of Lafayette, Louisiana. Defendant is a French national residing in France.

A.S. alleges she was raped by defendant Edouard d'Espalungue d'Arros on September 30, 2018, during a Catholic student retreat in Rapides Parish. At the time, A.S. was 21-year-old senior at the University of Louisiana at Lafayette (ULL) and defendant was a 28-year-old graduate student and teaching assistant at Louisiana State University (LSU). A.S. immediately reported the rape and a few hours later, d'Espalungue was arrested by two Rapides Parish Sheriff's Office (RPSO) deputies and booked on a charge of sexual battery. Four days later, on October 4, 2018, defendant was re-arrested by RPSO detectives after further investigation and was booked on a charge of second-degree rape. He was released on bonds totaling $100,000.

Twenty-eight months elapsed before the Rapides Parish District Attorney took steps to prosecute, during which time plaintiff was required on multiple occasions to speak with detectives and travel to Alexandria for meetings and/or hearings. On February 23, 2021, the case was finally presented to a grand jury, which indicted defendant on a charge of third-degree rape. By that time, however, defendant had returned to France, having been given permission by the 9th Judicial District Court to spend the 2020 Christmas holidays with his family in Paris. D'Espalungue did not inform the state court that he was suspended from LSU for a year after being charged with rape of an LSU student. He has never returned to Louisiana despite the court giving him several extensions of time. The state district court revoked d'Espalungue's bonds on March 26, 2021, and a "no-bond" arrest warrant was issued.

A survivor of childhood sexual abuse, A.S. alleges that after the rape, she developed post-traumatic stress syndrome (PTSD), was hospitalized in a psychiatric hospital, and eventually dropped out of her master's program in clinical counseling. Plaintiffs allege that d'Espalungue is a serial sexual predator who particularly revels in destroying the innocence of young Catholic women, as evidenced by handwritten papers found during a search of his backpack, witness statements, and evidence obtained from a search of defendant's cellphone. Accordingly, in addition to general and special damages, A.S. seeks exemplary damages under La. C.C. art. 2315.8 because her injuries "were caused by a wanton and reckless disregard for [her] rights and safety" and she meets the protected status of a "dating partner" under Louisiana law. Plaintiff's parents, John and Mary Doe, seek damages for loss of consortium.

Plaintiffs followed all protocols for service under the Hague Convention and upon plaintiffs' motion, the Clerk entered a default on July 6, 2022. Pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure, an evidentiary hearing was held on October 12-13, 2022.

Based on the record of proceedings in this matter, plaintiffs submit the following proposed Findings and Conclusions.

**PARTIES**

**Jane Doe (A.S.)**

At the time of this retreat, Plaintiff, A.S., was a 21-year-old 5'3" tall female student from UL-Lafayette and a senior in the Department of Counseling Education and was scheduled to graduate from with a BS in Psychology and a Minor in Child and Family Studies in May of 2019. Her goal was to then apply to ULL's Master's Program in Counseling Education and become a Licensed Professional Counselor and Certified Play Therapist because it was her dream to help children who had been the victim of childhood sexual assault (CSA).

A.S. herself had been the victim of childhood sexual assault at a very young age and struggled with anxiety, depression, feelings of shame, self-blame and self-worth issues throughout middle school, high school and college. In the two years prior to this incident, she had seen professional counselors, and sought emotional support and spiritual guidance over a dozen times to address unresolved issues from her childhood trauma and the lingering effects of an unhealthy relationship and breakup with a boyfriend. Nonetheless, during this time she was functioning well, had an excellent academic record and was actively pursuing her dream.

However, A.S. had not been able to fully process or resolve the emotional and psychological effects of her own prior traumas which left her with an impaired ability to process any new trauma and made her particularly susceptible to extreme, severe and devastating emotional distress, psychological damage and functional consequences. These childhood experiences and unresolved issues also made her easy prey for a tall, handsome, athletic, well-educated, articulate and seemingly prayerful Parisian she met on the first night of the retreat.

**John and Mary Doe (J.S & D.S.)**

Plaintiffs, John Doe (J.S.) and Mary Doe (D.S.) are the biological parents of Plaintiff, Jane Doe (A.S.). They have been married for 34 years have one (1) son and three (3) daughters). A.S. is the youngest of their four children.

**Edouard d'Espalungue d'Arros (d'Espalungue)**

Defendant, Edouard d'Espalungue d'Arros, a 6'2" tall, 28-year-old foreign national from France and son of French nobles (who live in the affluent 15th District of Paris), resided in Baton Rouge where he was a PhD candidate in the LSU French Department teaching freshman level French courses.

D'Espalungue had been invited to attend this weekend retreat by an 18-year-old ULL freshman ("M.B.") who believed that she was his girlfriend.

However, when it comes to d'Espalungue's actual history, educational background or current status, it is very difficult to distinguish fact from fiction. In various internet postings he claims to speak two languages in addition to French (English and Spanish) and to hold a degree in Econometrics and Information from the University of Aix-Marseille, a Master's degree in Finance from Queen's University in Canada and a Master's in Arts degree from LSU-Baton Rouge (2019) ("graduating as a Research Assistant in 2020").[1]

In this particular post, d'Espalungue also boasts about how he started working in the international financial sector while still a journalist and how his fund-raising operations in the aeronautics and technology fields were so successful that he was considered such an "essential

---

[1] R. Doc. 24-4, P03-004-7.

man" at KPMG they sent him to their London office to manage their merger and acquisition activities.[2]

On the Superprof webpage "Find Your Tutor", using an assumed name of "Jacques", he claims to have a Master's degree in English Literature from NYU, that he lived in the U.S. for 15 years and that he teaches English for all levels (college, high school, prep, university, *grandes ecoles*, business). He then offers his tutoring services for exams, competitions, GRE, SAT, ACT.... "Paris 15e, At his home, At your home, webcam".[3]

While out on bond for the 2018 criminal charges in Avoyelles Parish, d'Espalungue allegedly went after other victims in Baton Rouge.[4] Three young women in the LSU French department allege that he raped or sexually assaulted them in 2019 and 2020. LSU suspended d'Espalungue in December 2020 for sexual misconduct but a few days later, he flew to Paris and has never returned. An international warrant for his arrest remains outstanding for "third degree" rape in Avoyelles Parish.[5]

## FINDINGS AND CONCLUSIONS

### *Jurisdiction and Procedural Matters*

1. This court has original subject matter jurisdiction pursuant to 28 U.S.C. §1332(a)(2) as this is a suit between citizens of Louisiana and a citizen or subject of a foreign state who is not lawfully admitted for permanent residence in the United States, and the amount in controversy meets the jurisdictional requirement.

---

[2] R. Doc. 24-4, P03-006.
[3] R. Doc. 24-4, P05-002.
[4] On February 23, 2021, d'Espalungue was indicted by an Avoyelles Parish Grand Jury and charged with third degree rape (La. R.S. 14:43). By this time, he had already absconded to France in December of 2020 where he remains on the lam, his bond has been revoked, there is an international warrant for his arrest and he has evaded service in this civil proceeding.
[5] *See* Fn. 27.

2. Venue for this action lies in this Court pursuant to 28 U.S.C. §1391(b)(2) because the alleged rape occurred in the Western District of Louisiana. Further, since d'Espalungue is a foreign national and is not a resident of the United States, he may be sued in any judicial district under 28 USC §1391(c)(3).

3. Pursuant to La. Civ. Code art. 3496.2, this action is timely filed as delictual actions against a person for any act of sexual assault, as defined in La. R.S. 46:2184,[6] is subject to a liberative prescription of three years from the day the injury or damage is sustained. Plaintiffs allege defendant raped A.S. on September 30, 2018, and this suit was filed on February 22, 2021, well within the three-year limitations period. Accordingly, this suit is timely filed.

4. Service of process in this matter was made under the Hague Convention.

5. After his arrest and booking on a charge of second-degree rape on October 4, 2018, defendant, through his criminal defense attorney, J. Michael Small, obtained permission from the 9th Judicial District Court on November 30, 2020 to fly to Paris, France on December 14, 2020, and to return to Louisiana on December 27, 2020.

6. Defendant did not return despite numerous requests for extension, and his bonds were ultimately revoked on March 26, 2022.  Defendant was indicted for third-degree rape on February 23, 2021, and a "no-bond" warrant was issued for his arrest on March 29, 2021.

7. Plaintiff filed this complaint on February 22, 2021, after d'Espalungue had already fled the country.

---

[6] La. R S. 46:2184 states, "For purposes of this Chapter, 'sexual assault' means any nonconsensual sexual contact including but not limited to any act provided in R.S. 15:541(24)…". The latter provision includes La. R.S. 14:41 (rape), R.S. 14:42 (aggravated or first-degree rape), R.S. 14:42.1 (forcible or second-degree rape), R.S. 14:43 and (simple or third-degree rape), and R.S. 14:43.1 (sexual battery).

8. Plaintiffs have complied with all requirements of service of process. Federal Rule of Civil Procedure 4(f)(l) states that a person who is not located within the United States may be served with process "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."

9. The United States and France both ratified the Hague Convention. Application of the Hague Convention is mandatory in all cases that come within its scope, which are those cases where there is "occasion to transmit a judicial or extrajudicial document for service abroad." *See* Hague Convention, Art. 1; *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 700, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988) (describing methods of international service of process under the Hague Service Convention). "If the internal law of the forum state defines the applicable method of serving process as requiting the transmittal of documents abroad, then the Hague Service Convention applies." *Schlunk,* 486 U.S. at 700, 108 S.Ct. 2104.

10. Plaintiffs retained Ancillary Legal Corporation to accomplish translation and service of process of defendant in France under the Hague Convention. The translated service documents were delivered to France's Central Authority in Paris — the Ministère de la Justice - on July 22, 2021.[7]

11. On February 28, 2022, the Ministère de la Justice issued an official certification that service of process could not be made on defendant because, "Recipient did not reply to the request of the Police to appear before them."[8]

---

[7] R. Doc. 6-1, p. 2, ¶ 6.
[8] R. Docs. 12-1 and 12-2, Affidavit in Support of Request for Entry of Default and Official file and Certification from the Ministère de la Justice in Paris. R. Doc. 12-2, pp. 8-10 shows that police spoke to defendant by telephone and a meeting was set up for November 18, 2021, but defendant did not appear. Another meeting was scheduled for February 1, 2022, but again defendant did not appear.

12. The record shows that police officials communicated with d'Espalungue, and three separate meetings were scheduled for him to appear to receive service of the documents, but he never appeared.[9]

13. Pursuant to Article 15 of the Hague Convention, if the central authority fails to provide a certificate of service within six months, the plaintiff may move for default judgment.

14. Plaintiffs waited more than seven (7) months for service to be made on defendant, and the record shows service could not be made because defendant refused to attend meetings scheduled by the police for service of the complaint.

15. Although the record shows defendant has avoided formal service, the court took additional steps to notify defendant of case developments, including the motion for default and the scheduling of an evidentiary hearing. The court held a status conference with plaintiffs' counsel on June 30, 2022.[10] In light of the certification from the French Central Authority that defendant did not appear several times for service of complaint after police request, it was determined that plaintiffs would move for entry of default and for scheduling of an evidentiary hearing.

16. At the status conference, it was also ordered that plaintiffs' counsel provide all known addresses and email addresses for defendant so that the Clerk may apprise him of orders of the Court and any hearing dates."[11]

---

[9] R. Doc. 12-2, pp. 9-10, 12, 18 showing meetings were scheduled for October 26, 2011, November 18, 2011 and February 1, 2022. Police spoke to d'Espalungue by telephone at least once on October 21, 2021 (*Id*., p. 9).
[10] R. Doc. 11.
[11] *Id*.

17. Plaintiffs moved on July 6, 2022, for entry of default, showing that all requirements of service under the Hague Convention had been followed and that the defendant failed to plead or otherwise defend.[12]

18. The Clerk of Court properly entered a default against defendant on July 6, 2022.[13]

19. On July 15, 2022, in accordance with instructions from the Court, Plaintiffs filed a Motion for Ex Parte Order Directing the Clerk of Court to Mail Copies of Default and Order Setting Evidentiary Hearing to Defendant via International Registered Mail.[14] The motion included two known addresses for defendant in France, one being the permanent residence of his parents at 65 Avenue Marceau, 75116 Paris, France, which is the address listed on the "no bond" arrest warrant issued on March 29, 2021 in *State vs. Edouard d'Espalungue*, Criminal Docket #340,627 (9th JDC, Rapides Parish, Louisiana).[15]

20. The Order to Serve was entered on July 18, 2022, by Magistrate Judge Carol Whitehurst, directing the Clerk of Court to mail copies of the documents to defendant as requested.[16]

21. On July 19, 2022, the Clerk mailed to defendant, at two different addresses, 38 pages of documents related to the default and the scheduled evidentiary hearing via International Registered Mail.

---

[12] R. Doc. 12, Request for Entry of Default, supported by R. Doc. 12-1 (Affidavit) and R. Doc. 12-2 (Certification and records from the French Central Authority showing efforts made to serve defendant with a copy of the complaint and other required documents).

[13] R. Doc. 13.

[14] R. Doc. 16.

[15] R. Doc. 24-3, Criminal Record *in globo*, pp. 115-116. A web search also shows that 65 Avenue Marceau continues to be the address of defendant's father, Arnaud Philippe d'Espalunge d'Arros. *See* https://www.pappers.fr/entreprise/marceau-patrimoine-802182527, accessed April 16, 2023.

[16] R. Doc. 17.

22.  The envelope addressed to defendant's parents' permanent address was returned on September 26, 2022, marked unclaimed.[17] The envelope addressed to defendant at a second address in Cap Ferret, France, which on information and belief is owned by defendant and/or his mother, was returned on October 26, 2022, also marked "unclaimed."[18]

23.  The Clerk of Court mailed additional notices of court orders to defendant at his parents' Paris address which have also been returned.[19]

24.  In addition to the postal notices, pursuant to the Court's instructions, Plaintiffs emailed copies of key pleadings to two email addresses known to have been used by Edouard d'Espalungue, and to an email address of d'Espalungue's Paris attorney Pierre Hourcade, and no response has been received.[20]

25.  The email address plaintiffs used to copy attorney Pierre Hourcade was contact@frenchattorney.com, which address appears on each page of his affidavit (see discussion *infra* at ¶ 28-29) and is also still used at his website.[21]

26.  Plaintiffs' counsel Elwood Stevens received an initial confirmation that Pierre Hourcade read one of the emails, [22] but another email came back "no longer a valid address."[23]

---

[17] R. Doc. 19, returned envelope with 38 pages of contents. The envelope was marked, "Pli avisé et non réclame."
[18] R. Doc. 25, returned envelope with 38 pages of contents, also marked, "Pli avisé et non réclame."
[19]  On February 15, 2023, the Clerk mailed to defendant at the Paris address a copy of the order of the same date granting an extension of time for plaintiffs to file their proposed findings of fact and conclusions of law. It was returned to the Clerk unclaimed on April 10, 2023 marked "addressee unknown at marked address." R. Doc. 41. A similar order was mailed on March 7, 2023 and was also returned April 10, 2023 with the same notation. R. Doc. 42.
[20] R. Docs. 24-10 and 24-15 (P24 and P31) are copies of emails sent to these three addresses by plaintiffs' counsel Elwood Stevens. A discussion of these emails is contained in the transcript of the evidentiary hearing at Tr. 97:22-25; 98:1-25; 99:1-13 (Baker). *See also* Certificates of Service contained in R. Docs. 12, 14, 14-1 and 16.
[21] *See* http://www.franceavocat.com/contact-us/, accessed April 16, 2023.
[22] Baker, Tr. 98:11-17; P24.
[23] Baker, Tr. 98:21 – 99:7; P31.

27.   The court concludes it is more likely than not that d'Espalungue and/or his Paris Attorney received the emails sent by plaintiffs' counsel, and that defendant's refusal to respond, to appear at meetings scheduled by police for service of documents, and refusal to claim documents mailed to him by the Clerk of Court after being notified by French postal authorities indicate intentional efforts to avoid service.

28.   As noted above, defendant left the United States on December 14, 2020 and was supposed to return on December 27, 2020.[24] Although he has never returned, the criminal case record shows he feigned two attempts to return in early 2021, utilizing attorney Pierre Hourcade as a retained airport "witness."

29.   At a hearing on February 11, 2021, defense attorney J. Michael Small offered into evidence Hourcade's affidavit, which stated he witnessed d'Espalungue trying to board a flight to the United States on January 8, 2021, at Charles de Gaulle airport in Paris and being prevented by a "U. S. Marshall."[25] According to the affidavit, the Marshal told d'Espalungue that his visa had been revoked and when questioned further,

> He confirmed that his visa had been revoked. Mr. D'Espalungue asked him if he could come back in the US in the future or if he was banned, and he told him: Yes, you are, you have been arrested and went to court. You will not board a flight to come to the US. Mr. D'Espalungue was surprised that he and the District Attorney and the Judge had not been informed that his visa had been revoked, and that they let him go back to France. He then asked us to leave the area immediately. We left the airport accordingly around 1:15 pm.[26]

---

[24] R. Doc. 24-3 (P07), Criminal Record, pp. 77-81.

[25] The Hourcade affidavit was admitted as D-1 at a February 11, 2021 hearing before Judge Hazel (R. Doc. 24-3, p. 119). It is also referenced in a defense motion (R. Doc. 24-3, pp. 105-106). For an unknown reason, the affidavit itself is not included in the record provided by the 9th JDC Clerk of Court. See Second Motion for Leave of Court to Supplement Record filed this date, page 2, ¶ 4, and Memorandum in Support, which includes a copy of the Mssr. Hourcade's affidavit (P-36).

[26] Hourcade affidavit, p. 2. It appears from the Hourcade affidavit (p.3) that d'Espalungue attempted to board a one-way flight to Atlanta.

30. In fact, defendant was undoubtedly aware that his student visa had been revoked by LSU at the end of 2020 after LSU student "K.C." filed a sexual assault complaint against him and underwent a rape kit procedure.[27]

31. LSU held disciplinary proceedings against d'Espalungue in the fall of 2020 which resulted in finding him guilty of non-consensual sex (rape) which constitutes student misconduct.[28] The suspension resulted in revocation of d'Espalungue's student visa.[29] This meant that he could no longer use his student visa to re-enter the United States. Knowing that, d'Espalungue created an elaborate ruse that he was attempting to return to the United States to face criminal charges but that he was being barred *because he had been arrested*, not because he was trying to fly on a student visa he knew had been revoked.

32. The Court concludes that entry of a default judgment is appropriate in this matter. Although default judgments are disfavored and should be granted "only when the adversary process has been halted because of an essentially nonresponsive party."[30] This is such a case.

33. Defendant has failed to file a responsive pleading or otherwise appear in this case. Defendant absconded to France in December 2020 while out on bail with appearance bonds totaling $100,000.

---

[27] *See* Second Motion for Leave of Court to Supplement Record filed this date, page 2, ¶ 5, and Memorandum in Support, pp. 6, 8-9, which discuss the Complaint in Jane Doe #1 et al vs. Board of Supervisors of LSU, et al, C. A. No. 3:21-00564-SDD-SDJ (M.D. La. 10/4/2021). At the evidentiary hearing, plaintiffs offered this record into evidence (marked P-27), but the court declined to admit it on the grounds argued: for the truth of the allegations (Tr.46:14-47:11). Plaintiffs request in the motion filed today that the court admit P-27 pursuant to FRE 404 (b) and 413 to show motive, intent, identity and modus operandi.

[28] *See* Second Motion for Leave of Court to Supplement Record filed this date, page 1, ¶ 2, (P-34), Title IX Case Record of K.C., and Memorandum in Support.

[29] *See* Second Motion for Leave of Court to Supplement Record filed this date, page 1, ¶ 1, and Memorandum in Support, which includes a copy of Detective Cainan Baker's Declaration (P-33). Even with revocation of his student visa, travel to the United States would still be possible. However, using a tourist visa requires the purchase of a round-trip ticket.

[30] *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998) (quoting *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970)).

34. Rule 55(b) grants district courts wide latitude in deciding whether to require an evidentiary hearing before entering a default judgment. *G&G Closed Cir. Events, LLC v. La Papa Loca LLC*, No. 6:21-CV-02610, 2022 WL 2718228, at *2 (W.D. La. July 12, 2022).

35. In cases where a plaintiff's claim is not for a sum certain, a default judgment must be entered by the court. Fed. R. Civ. P. 55(b)(2). The court "may conduct hearings" when necessary to "(A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." *Id*.

36. Plaintiffs moved for an Evidentiary Hearing pursuant to Rule 55 and provided a Preliminary Witness List.[31]

37. An evidentiary hearing was held on October 12 and 13, 2022, pursuant to Rule 55(b)(2). While an evidentiary hearing is not a *per se* requirement of Rule 55(b)(2), as the language is permissive, in this case it was necessary to fully inform the court as to both liability and damages. *S.E.C. v. Smyth,* 420 F.3d 1225, 1232 (11th Cir. 2005).

38. The court heard extensive testimony and also admitted into evidence a number of witness declarations and documentary evidence.

## CLAIMS ASSERTED

Plaintiff A.S. seeks past and future compensatory damages under Louisiana Civil Code art. 2315 for sexual assault, battery, rape, negligent and/or intentional infliction of emotional distress. In addition, A.S. seeks punitive damages under La. Civil Code art. 2315.8. Plaintiffs J.S. and D.S. seek compensatory damages for loss of consortium under art. 2315 (B)

---

[31] R. Docs. 14, 14-2.

39. La. Civil Code art. 2315 provides that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it."

40. Louisiana adopts a "duty-risk" analysis for assigning tort liability under art. 2315 which requires that Plaintiff establish that (1) she suffered an injury; (2) the defendant owed her a duty of reasonable care; (3) defendant breached that duty; (4) defendant's conduct was the cause-in-fact of the resulting harm; and (5) the risk of harm was within the scope of protection afforded by the duty (an ease of association between the damages and the duty breached by the defendant).

41. One injured through the fault of another is entitled to full indemnification for the damages caused.[32]

42. Under Louisiana law, tortfeasors take their victims as they find them and are responsible for all natural and probable consequences of their tortious conduct.[33]

43. If the victim is particularly vulnerable to an emotional collapse and defendant's conduct activates or aggravates an underlying or pre-existing condition, he must compensate the victim for the full extent of the aggravation. As the trier of fact, this Court has broad discretion to determine quantum.[34]

44. An injured person is entitled to recover full compensation for all damages that proximately result from a defendant's tortious acts, even if some or all of the injuries might not have occurred but for the plaintiff's preexisting physical condition, disease, or particular susceptibility to injury.[35]

---

[32] La. Civ. Code art. 2315. *Wainwright v. Fontenot,* 2000-0492 (La. 2000).
[33] *Lasha v Olin Corp.*, 625 So.2d 1002, 1005 (La. 1993); *Perniciaro v. Brinch*, 384 So.2d 392, 395 (La. 1980); *Cazenave v. Pierce,* 568 So.2d 1360 (La. 1990); and *Arruebarrena v. Boh Bros. Const. Co.,* 539 So.2d 78 (La. App. 4 Cir. 1989).
[34] La. Civ. Code art. 2324.1.
[35] 2 *STEIN ON PERSONAL INJURY DAMAGES §* 11 (3d ed. 2020).

45. Damages are to be evaluated and assessed in light of the particular injuries and their effects on the particular injured person(s).[36]

46. Intentional infliction of emotional distress is established when the evidence demonstrates that: (1) the conduct was outrageous in character; (2) so extreme in degree as to go beyond all possible bounds of decency and (3) regarded as atrocious and utterly intolerable in a civilized community.[37]

47. Plaintiffs J.S. and D.S., as the parents of A.S., assert causes of action under La. Civil Code art. 2315 (B) allows recovery for "loss of consortium, service, and society."

48. Loss of consortium awards are fact-specific determinations, decided on a case-by-case basis. Parents must prove a measurable loss of any one or more of the following: (1) loss of love and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity.[38]

49. La. C.C. art. 2315.8 provides for recovery of exemplary damages in cases of "wanton and reckless disregard for the rights and safety of a family or household member, as defined in R.S. 46:2132 [*which now includes a "dating partner"*], through acts of domestic abuse resulting in serious bodily injury or severe emotional and mental distress."[39]

---

[36] *Reck v. Stevens,* 373 So.2d 498 (La. 1974).
[37] *White v. Monsanto,* 585 So.2d 1205, 1209 (La. 1991).
[38] *Mitchell v. Roy*, 51 So. 3d 153, 167, (La. App. 3 Cir. 11/3/10), *writ denied*, 2010-2695 (La. 1/28/11), 56 So.3d 957; and *Harper v. State ex rel DHH*, 176 So.3d 479, 492 (La. App. 4 Cir. 9/9/15).
[39] **Art. 2315.8. Liability for damages caused by domestic abuse**.
    A. In addition to general and special damages, exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton and reckless disregard for the rights and safety of a family or household member, as defined in R.S. 46:2132, through acts of domestic abuse resulting in serious bodily injury or severe emotional and mental distress, regardless of whether the defendant was prosecuted for his or her acts.
    B. Upon motion of the defendant or upon its own motion, if the court determines that an action seeking damages under this Article is frivolous or fraudulent, the court shall award costs of court, reasonable

50.  The laws which broadened protections of domestic abuse to "dating partners" became effective in 2017. The definition of "dating partner" is set forth in La. R.S. 46:2151(B):

> B. For purposes of this Section, "dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.

51.  "Dating Partner" is defined in La. R.S. 46:2151(B) as any person involved in an "intimate relationship characterized by the expectation of affectionate involvement" in a "sexual or intimate" relationship.

52.  The original version of the bill introduced in 2017 to expand protections to "dating partners" (HB 233) contained factors to be considered in determining whether such a relationship existed. All of the factors were stripped from the bill before final passage. The factors eliminated were, "the length of the relationship; the type of relationship; and the frequency of interaction between the persons involved in the relationship."[40]

---

attorney fees, and any other related costs to the defendant and any other sanctions and relief requested pursuant to Code of Civil Procedure Article 863.

[40] The Digest of the reengrossed HB 223 (2017) describes the original language as follows (the "factors" were later stripped from the bill):

> Defines "dating partner", for purposes of the present law Protection from Dating Violence Act (R.S. 46:2151 et seq.), as any person who is or has been in a social relationship of a romantic or intimate nature with the victim and where the existence of such a relationship shall be determined based on a consideration of the following factors: the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

Floor amendments to Helena Moreno's original bill were accepted and the Digest of Reengrossed House Bill No. 223 (2017) states:

> (4) Defines "dating partner" as any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived

53. Plaintiffs contend this reflects a legislative intent that exemplary damages are available when violence is used in *any* intimate or sexual relationship where an "expectation of affectionate involvement" exists and the relationship is not merely "casual."[41] Each of these factors are present in this case, and the subject documents provide important additional relevant information.

## LIABILITY

Plaintiffs called three liability witnesses at the evidentiary hearing: Fr. Bryce Sibley, Det. Cainan Baker and Plaintiff, A.S. The evidence showed as follows:

54. The sexual assault/rape incident occurred during Encounter Weekend, September 28-30, 2018, an annual retreat of the Ragin' Cajun Catholics, a ULL student group affiliated with Our Lady of Wisdom Catholic Church (OLOW).[42]

55. The retreat was held off-campus at the Tall Timbers Conference Center in Rapides Parish. Approximately 150 students attended the retreat.[43]

56. The leader of the retreat was Rev. Bryce Sibley, Pastor and Chaplin at Our Lady of Wisdom and the ULL Student Center from 2010 to 2021.[44]

---

in the same residence with the offender. Provides that "dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.

Reengrossed H.B.223, 2017 Leg., Reg. Sess. (La. 2017).

[41] The definition of "dating partner" is set forth in La. R.S. 46:2151(B):

B. For purposes of this Section, "dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.

[42] A.S., Tr. 107:4-19; Sibley, 18:9-19:9.
[43] Sibley, Tr. 22:15-16.
[44] Sibley, Tr. 13:9-12; 18:13-14.

57. The theme of the retreat for this particular weekend was male/female relationships and how to identify and make wise choices about selecting the right mate/partner.[45]

58. According to Fr. Sibley, this is an important topic for all college students but it was particularly important for A.S. at the time because for 12-18 months prior she had been through a breakup and was still dealing with the turmoil. Thus, connecting and forming new relationships was a topic A.S. would have been particularly interested in.[46]

59. A.S. had been involved with the ULL Catholic student center since her freshman year at ULL and had grown close to Fr. Sibley who was her spiritual director and helped her with some healing and growth in her faith. This particular retreat was the first one that A.S. attended for the full weekend, however.[47]

60. A.S. felt her faith was something truly her own because she had come to her faith during her junior year of high school, and from that point became deeply involved in campus ministry.[48] She testified:

> So to me my faith was truly my own, something I needed. That's where I found comfort. That's where I found a lot of healing when I first decided to turn to God and began going to church, began praying. I found a lot of healing. I got rid of a lot of shame. I found a lot of love for myself, love for others.[49]

61. At the time of the incident on September 30, 2018, A.S. was a senior at ULL in the Department of Counseling Education and was scheduled to graduate in May of 2019 with a BS in Psychology and a Minor in Child and Family Studies. Her goal was to apply to ULL's Master's Program in Counseling Education and become a Licensed Professional Counselor and

---

[45] Sibley, Tr. 20:12-16.
[46] Sibley, Tr. 20:17-24.
[47] Sibley, Tr. 16:16-18:8.
[48] A.S., Tr. 107:20-109:3.
[49] A.S., Tr. 108:2-7.

Certified Play Therapist because it was her dream to help children who had been the victim of childhood sexual assault (CSA).[50]

62. A.S. was a survivor of childhood sexual abuse from an older girl who was a family member. It began when A.S. was about five years old and continued for more than a year or two. At such a young age, A.S. didn't understand what was happening, and when it was over, was left with feelings of abandonment as well as shame and self-hatred.[51]

63. While A.S. still had unresolved issues from her childhood, Fr. Sibley testified that prior to this retreat weekend she was: "very outgoing, bright personality, very happy, joyful, could really light up the room. Knew everybody. Was friends with everyone. Very devout, and people were drawn to her."[52]

64. Defendant, d'Espalungue, was invited to the weekend retreat by M. B., his then 18-year-old girlfriend. Both A.S. and M.B. were students at the University of Louisiana at Lafayette (ULL) and members of Ragin' Cajun Catholics, a student organization affiliated with Our Lady of Wisdom Catholic Church on campus.

65. At the time of the alleged rape on September 30, 2018, d'Espalungue was 28 years old, stood 6'2" and weighed 185 pounds.[53] A.S. was 21, stood 5'3" and weighed 150 pounds.[54]

66. A.S. had resisted going on overnight retreats in the past, but was pleased she decided to go this particular weekend because she had attended all of the talks and was particularly interested in those focused on healthy Christian and Catholic relationships.

---

[50] A.S., Tr. 150:15-151:1.
[51] A.S., Tr. 151:2-152:9.
[52] Sibley, Tr. 18:5-8; 16:25.
[53] Order of Protection, R. Doc. 24-3, p. 1.
[54] A.S., Tr. 121:13-22.

67. A.S. met Edouard on first day by introducing herself. On Saturday afternoon, she invited him on a hike with she and her friend J.B. during which they all talked about their backgrounds, educations, goals and plans.

68. Later that day, Edouard followed her to one of the last talks on Saturday evening (~9:30/10:00 pm) about Alpha and Beta Males and how to identify and choose a good mate.

69. After leaving this last talk, <u>A.S. observed Edouard writing in a journal</u> and invited him to the bonfire and she tried to teach him to Cajun dance earlier that evening.[55]

70. Before d'Espalungue asked her to leave the bonfire with him, so the two of them could go for a walk and continue their talks away from the noise of the singing and praise of others at the bonfire, he callously confirmed his intent to groom her when he wrote in his journal: "I feel the attraction she feels for me".[56]

71. Little did A.S. know but while she was experiencing the holy spirit during adoration, reflecting on the contents of Fr. Sibley's last talk and recalling conversations from her afternoon hike with d'Espalungue, remembering her effort to teach him to Cajun dance earlier in the evening and privately acknowledging her growing attraction to the charming Frenchman, d'Espalungue had already singled her out as being a "traditional Catholic" who he would take "much pleasure in changing" and had targeted her hips/glutes for sexual penetration.[57]

72. Edouard came to the bonfire and when the crowd thinned out it ended up being a conversation between to two of them. At this point, there was a group of <u>girls singing loudly</u> so

---

[55] A.S., Tr. 111:18-25.
[56] R. Doc. 36, P32-002.
[57] *Id.*

he asked her if she wanted to walk away from the bonfire so the two of them could continue to talk.[58]

73.   As they walked toward the lake, the path turns into a wooded area; it was dark and creepy, so she asked to go back to the retreat center but he said he meant to go the dock and asked if they could go there to sit and talk.[59]

74.   From the bonfire and along the path into the wooded area of the grounds, d'Espalungue's questions were geared toward the retreat and the talks about healthy relationships and how to build healthy, strong Christian and Catholic relationships.[60]

75.   Defendant wanted to know if she agreed with what they had heard in the talks about relationships being based on friendship first or whether they could just happen. A.S. told him that she believed that strong relationships start with friendship first but that "sometimes things just happen".[61] By the time the two of them arrived at the boat dock area, they had had a long walk and a long talk which had by then evolved into Edouard's impassioned declaration that he was serious about her and how he desired to date her and must kiss her now to be sure she understood just how serious he was.[62]

76.   Then, in the middle of a sentence, d'Espalungue kissed A.S., repeating that he "had to kiss her" so she would know that he was serious and because he knew it would be a while before he would able to see her again.[63]

---

[58] A.S., Tr. 112:12-14. This is precisely consistent with the hand written French notes found in d'Espalungue's black Adidas bag, that Det. Baker would later have translated in which he quotes the words from the "praise and worship" song they were actually singing. (R. Doc. 36, P32-001).
[59] A.S., Tr. 113:1-9.
[60] A.S., Tr. 113:11-16.
[61] A.S., Tr. 113:17-114:1.
[62] A.S., Tr. 109:15.
[63] Baker, Tr. 94:21-95:12; A.S., 114:15-115:5. From their long talks, d'Espalungue knew that A.S. was leaving for a scheduled vacation to Disney shortly after the retreat.

77. Consistent with his writings about his royal DNA and sexual entitlement, d'Espalungue explained that he it was impossible for him to abstain from sex and that he had known this since he was a teenager.[64]

78. Defendant continued kissing A.S. and became more aggressive, putting his hands in places she did not approve, even after she removed his hand and said in no uncertain terms, "that's enough", "we need to stop".[65]

79. D'Espalungue straddled himself on top of her, pinned her hands behind her on the wooden dock bench and would not take "NO" for an answer.

80. It was at this point she made a conscious decision that on the count of three she would try to escape from his grasp. However, when she tried to lift her head, her ponytail was trapped against the bench under his arm and she could not move her head. At this point she feared that if she fought back, he might harm her or throw her in the lake.[66]

81. The entire time they were on the dock, A.S. kept telling d'Espalungue to stop, that she did not want him to touch her and she wanted to leave and explicitly told him "NO". She repeatedly tried to scoot to the end of the bench in hope that she might be able roll out from underneath him but he constantly manipulated her body whichever way he wanted it to go.

82. She pleaded with him and even told him that she needed to get back to the cabins because she needed to take medicine at a certain time every night hoping that it would cause him to walk away and for the moment it worked.[67]

---

[64] A.S., Tr. 114:9-13. See: ¶103-1 (below).
[65] A.S., Tr. 115:19-116:7.
[66] A.S., Tr. 116:16-117:15.
[67] A.S., Tr. 117:16-23.

83. As they walked off the dock and stepped down onto the cement slab adjacent to it, he forced her to the ground, pinned one of her hands above her head and although she was crying, noticeably shaking and her lips were quivering he pulled down her leggings and underwear and penetrated her.[68]

84. Despite her efforts to escape, Edouard a 28-year-old 6'2" tall, very strong and athletic male overpowered A.S, a 5'3" tall female dancer and forcibly inserted his penis into her vagina.

85. A.S. vividly remembered and described the horror of being overpowered, the distinct fear of being beaten or drowned in the lake if she fought, the extreme darkness of the night, the recurring vision of seeing the tops of pine trees adjacent to the cement slab and the feeling of being completely powerless while d'Espalungue held her down and raped her.[69]

86. At this point, Edouard, stood up and left A.S. laying on the cement slab with her leggings and underwear at her knees.[70]

87. When she got up, she found a clear substance on her pants and confronted d'Espalungue; he said it wasn't his because he had not "finished" the act of sex and that he did not ejaculate.[71]

88. She also recalled that Edouard followed her back to the Activity Center even though she had told him that she did not want him to and forbid him to enter the building with her.[72]

89. Once inside, she saw the friend (J.B.) with whom she and Edouard had taken a hike earlier in the day and they went into the snack room. She immediately became hysterical, curled

---

[68] R. Doc. 24-12, P03-001; A.S., Tr. 118:7-25.
[69] A.S., Tr. 152:10-24; Baumer, R. Doc. 24-6, P16-002, para. 9, 10.
[70] A.S., Tr. 119:4-9.
[71] A.S., Tr. 158:12-18.
[72] A.S., Tr. 119:18-120:9.

into a ball, rocking back and forth and shaking. Eventually, she was calm enough to tell the missionaries and Fr. Sibley what Edouard had done and he called 911.[73]

90.  She recounted her interaction with Corporal Webb and the other Deputy Sheriff who responded and how they told her that if Edouard admitted to sexual penetration a rape kit would be pointless.[74]

91.  When the deputies came back from speaking with Edouard, they informed her that he had admitted to it on video and there was no point in going through with a rape kit because all it would show is that they had had sex.[75]

92.  As confirmed by Det. Baker, body cam video taken of d'Espalungue within a few hours after the incident demonstrated that he was being very evasive, trying to dodge questions with technicalities and trying not to answer anything directly; however, the d'Espalungue actually admitted to having had sex with A.S. but tried to claim it was consensual because "she did not resist".[76]

93.  Lab analysis of the substance on A.S.'s pants collected on the night of the incident (and which she claimed was Edouard's), was in fact seminal fluid which was a positive match with d'Espalungue's DNA.[77]

94.  Pursuant to a search warrant, Detective Cainan Baker and Charles Gunner conducted a search of defendant's backpack and photographed handwritten notes and loose papers found in a notebook which were hand written in French.[78]

---

[73] A.S., Tr. 120:10-20.
[74] A.S., Tr. 133:9-21.
[75] A.S., Tr. 134:5-15.
[76] Baker, Tr. 61:14-62:21.
[77] Baker, Tr. 62:11-18.
[78] Baker, Tr. 64:3-19.

95.   At the request of Det. Baker (chief investigator assigned to this case), a professor of French at Louisiana College (Dr. Julie Driessen) and a second interpreter from an international trade organization (Christophe Pilut) reviewed these writings and translated the contents of the notebook and the loose pages into English.[79]

96.   The translated writings from d'Espalungue's notebook were about school or d'Espalungue's teaching related matters; however, the French hand writings on loose paper precisely describe specific events and personal encounters of the weekend at Tall Timbers that only d'Espalungue would know.

97.   These writings eerily document d'Espalungue's reprehensible intentions and depraved state of mind leading up to the sexual assault and rape charge which formed the basis of Det. Baker's criminal investigation.[80]

98.   In no uncertain terms, these translated hand writings evince Defendant d'Espalungue's specific intent to groom A.S. and lure her into an expectation of an intimate relationship.[81]

99.   This Court finds further confirmation of this intent in Det. Baker's testimony that there was no doubt these hand-written notes belonged to d'Espalungue.

100.   The credible basis of his conclusion is the fact that these writings were (a) found in d'Espalungue's Adidas overnight bag along with a notebook containing LSU school assignments, (b) were hand written in French, (c) all entries in both the notebook and the loose papers appeared to be in the same handwriting, and (d) the writings contained intimate details that only the defendant himself would have known.

---

[79] Baker, Tr. 64:24-66:16, P32. These translations were read into the record by Det. Baker at the time of the hearing; however, the record has since been supplemented to include a copy of the type-written transcripts upon which he relied as Exhibit P32 (R. Doc. 36).
[80] Baker, Tr. 64:24-65:10.
[81] Baker, Tr. 68:9-69:19.

101. Likewise, the facts and circumstances described in these handwritten notes matched factual details which Det. Baker had previously and consistently heard directly from the victim.[82]

102. A sufficient evidentiary basis was presented to support the conclusion that these writings were created by Edouard d'Espalungue.

103. Excerpts from d'Espalungue's personal writings, include the following grossly indecent remarks:[83]

1. *"I caress… the juicy ass of **M.B.** (uses full name) before confessing at the church…I smile at her and tell her, to provoke her…'love your juicy ass'. She sighs. She knows me. <u>I am a good Catholic but for sex, I am loyal to my DNA, a noble one who allows him to penetrate whom he wants, when he wants, where he wants.</u>"*
2. *"I begin to kiss **M.B.** (uses name) in church, but she turns away, I hold her wrists to control her… I love that my sexual (fulgurances) stay private, invisible from the public…[84] When, in the street, I grab her breasts or her butt, I always make sure before there is anyone in front or behind".*
3. *"It is felt immediately when a girl is interested in you: her eyes glimmer, she asks you often and only you, questions without significance, and she smiles, laughs at the end of all your sentences."*
4. *"She is good but she is part of these traditional Catholics that one is not supposed to f _ _ _ with on the lapse time of an evening _____. She has a rather open demeanor and talks about her ex. I will be surprised if she is still a virgin. She has a few _____ like **M.B.** (uses name). <u>These glutes are well game and perfectly indicated for anal. My madeleine</u>".*
5. *"Return from the walk. She invites me to Cajun dance tonight with her. Why not. **I participate in an <u>hour of man up training</u> organized by the two priests on <u>how to step up your game with girls</u> and <u>being true alpha males</u>. These ideas of alpha and beta males can only make one smile by the simplicity, but they cover some <u>profound truths regarding relationships and what women....</u>"***
6. *"Coming after mass is a presentation on chastity that I will gladly miss.... **<u>There is another hour with the chaste ones of God with whom I have much pleasure in changing</u>**. Each time that I speak they listen silently and agree with all my words. My suggestions make sense, it is simply experience talking. **I leave them for a walk with a girl A.S. (uses name)**, who wanted absolutely that I walk with her and a guy, J.B. (uses name), tall, blond, rather athletic blue eyes; a nice American from teen movies of my childhood. **<u>I feel the attraction that she feels for me.</u>** This is bizarre".*

---

[82] Baker, Tr. 70:24-72:25.

[83] Note: Quoted excerpts 1 and 2 relate/refer to M.B. (the ULL freshman who invited d'Espalungue to this retreat); whereas quoted excerpts 3-6 relate/refer to Plaintiff, A.S. R. Doc. 36, P32-001-002 (emphasis supplied). *See* Second Motion for Leave of Court to Supplement Record filed this date, page 2, ¶ 3, and Memorandum in Support, which includes a copy of M.B.'s Sworn Declaration (P-35).

[84] The French word *fulgurances* means: sudden display of brilliance; synonym: illumination. *Wiktionary.*

104. An even earlier notation in 28-year-old d'Espalungue's hand written notes foretells that his motive for attending the retreat was to attract and groom young girls for sex.

 a. While the group was still gathering at the ULL campus in Lafayette, d'Espalungue writes about how Domino's pizzas were delivered prior to departing for Tall Timbers Friday afternoon on "these famous yellow buses which serve the schools" and confirms his brazen intent to foster false expectations among the young unwary religious females on this trip: *"I take advantage of this to vanish while others are eating to go shave my beard in the bathroom.  __Most of the students are between 18 and 20 years old.  A beard is not really good if one wants to socialize without hindrances."*[85]

105. After conducting his investigation into the sexual assault/rape incident, interviewing multiple witnesses and reviewing body cam video statements by A.S. and Edouard, as well as, cell phone messages from d'Espalungue's cell phone, the careful examination of his translated hand writings and personal interviews with at least two other young women in Baton Rouge who also claim that he groomed them into a relationship and then forced himself upon them, Detective Baker concluded that Edouard's "MO" (*modus operandi)*  was that he "enjoyed destroying innocence".[86]

106. According to Det. Baker, what really excited d'Espalungue was specifically "religious virgins" and both LS (one of his freshman students at LSU) and MB (the young ULL freshman who he had gone to the retreat to see) fit this same profile.[87]

---

[85] R. Doc. 36, P32-001 (emphasis supplied).
[86] Baker, Tr. 82:1-10.
[87] Baker, Tr. 82:11-20.

107. In the final analysis, the lead investigator on this matter, Detective Cainan Baker, was credible and convinced the Court that this was not a sexual battery case but a second- or third-degree rape and the grand jury agreed.[88]

108. D'Espalungue's writings lead to the inescapable conclusion that Defendant, Edouard d'Espalungue, acted with such a level of depravity, salaciousness and sadistic pleasure that he actively intended to inflict physical, emotional and spiritual harm upon this vulnerable victim and all women like her (while on the sacred grounds of a religious retreat focused on Christian relationships).

109. The court further concludes that Edouard d'Espalungue sexually assaulted, battered and forcibly penetrated A.S. based upon the total weight of credible evidence presented, including:

    a.   his personal writings,

    b.   the body cam interview on the night of the incident in which he admits having had sex with A.S. but attempts to claim that she did not resist,

    c.   a positive DNA test confirming that the seminal substance on A.S.'s pants in fact belonged to d'Espalungue,

    d.   the testimony of Fr. Sibley, Det. Baker, information from two female missionaries who attended to A.S. and the very credible and entirely consistent testimony of the victim herself that she reported the rape immediately, was hysterical and visibly in shock as soon as she returned to the activity center, and identified the French LSU student as the person who had raped her,

---

[88] Baker, Tr. 55:15-23; 80:11-23.

    e.  that she was on her menstrual cycle and had to extract a bloody tampon from deep inside her body, and

    f.  the testimony of Fr. Sibley and multiple counselors/therapist who knew her well before this night who universally agreed that the when A.S. says "NO" she means "NO" and if this sexual encounter would have been consensual, she would have made necessary preparation and removed the tampon.[89]

110.  The court finds further support for the conclusion that A.S. was sexually assaulted, battered and forcibly penetrated in Det. Baker's testimony that he had carefully scrutinized this case to see if he could find a motive for the victim to fabricate a story or otherwise not tell the truth but was never able to find one, in addition to how adamant and convincing she was that her account of what happened to her that night was "absolutely the same every time".[90]

111.  The Court agrees that the fact A.S. was sober and not inexperienced but still had a tampon inserted are conditions under which consensual sex is not likely to occur and further support the conclusion that Defendant, forcefully penetrated A.S.[91]

112.  At the time of the rape, A.S. was not on birth control, but remembers the horrible thoughts that crossed her mind when the investigating officers told her she would have to take a pregnancy test (even though she was on her period).[92]

---

[89] The fact that this tampon had been pushed so far up into her body that it took about 15 minutes to be retrieved/extracted (saturated bloody string and all) and required the assistance of two female missionaries, is compelling evidence of non-consensual penetration. Baker, Tr. 84:5-85:3; 90:4-24.

[90] Baker, Tr. 77:3-6; 83:7-20. Even the physical layout of the crime scene turned out to be entirely consistent with the details that she described to Detectives Baker and Gill when they later visited the scene to take photographs and videos. Det. Baker confirmed that when he and Detectives Gill and Isles visited the scene, they even made certain that it was on a night with a similar moon phase and cloud cover. **"I would definitely describe it as dark and secluded".** Baker, Tr. 75:10-22.

[91] Baker, Tr. 77:8-11.

[92] A.S., Tr. 159:2-16.

113. After the rape, A.S. immediately quit her ministry work with younger students because felt she didn't have the emotional energy to deal with other people's problems, and this has continued to the present. A.S. testified, she didn't feel she was a safe person for people to turn to,[93] and, "I don't think I could ever have what it takes to be a counselor. I don't think I can, you know, provide that empathy for people anymore."[94]

114. Fr. Sibley is currently professor of Moral Theology at Notre Dame Seminary in NOLA since July 2021, but prior to that he was the Pastor and Chaplain at Our Lady of Wisdom Catholic Church and Student Center on the UL Lafayette campus from 2010-2021.

115. While Fr. Sibley had no formal training as a professional counselor, he explained his experience counseling college students and young adults and how he had worked in collaboration with licensed professionals to help them overcome trauma.[95]

116. He knew A.S very well before and after the events of September 28, 2018 at Tall Timbers retreat center.

117. Fr. Sibley testified that he got to know A.S. when she was a freshman at ULL in the fall of 2015 and understood that she had been involved in campus ministry during high school. He noted that "church was her place" and described her as having a very outgoing and bright personality, very happy and joyful and one who could really light up a room.[96]

118. According to Fr. Sibley, A.S. was very devout in her faith, knew everybody and that people were drawn to her. She quickly became actively involved in campus ministry at ULL, was a regular presence at the Lady of Wisdom Student Center and participated in bible studies

---

[93] A.S., Tr. 150:4-12.
[94] A.S., Tr. 148:15-17.
[95] Sibley, Tr. 14:14-15:8.
[96] Sibley, Tr. 16:16-17:12; 18:2-8.

and retreats. Fr. Sibley served as her pastor and spiritual director for the four-year span (2015-2019) of her undergraduate program at ULL.[97]

119. Over the years that Fr. Sibley has known A.S., he found her to be remarkably truthful. He described her as a most honest and direct person not only about herself but about other people as well.[98]

120. According to Fr. Sibley, the talks for Saturday, September 29th ended around 9:30/10:00 pm and students were allowed to go to either of a couple of bonfires and gather for fellowship.

121. Fr. Sibley retired for the evening around 10:00/10:30 and recalled that his cell phone rang at 1:00/1:30 a.m. (Sunday a.m. September 30, 2018). The caller was a volunteer student who informed him that there was a female student who is just in "hysterics" in the activity building. When he asked who it was, the caller told him it was A.S.[99]

122. Fr. Sibley walked into the snack room of the activity building within a few minutes of receiving the call and found A.S. on the dirty floor almost in a fetal position and in complete hysterics, screaming, yelling, wailing, rocking back and forth.[100]

123. Two female missionaries, who helped him with the retreat, were attending to her and trying to give her comfort and support. However, at that moment, A.S. was wailing and not able to even discuss what had happened with him. It was obvious to him that this was a very bad situation so he offered to have her tell the missionaries.

124. Fr. Sibley had never seen A.S. or anyone else in this position before so he stepped out to give her a little personal space and privacy. Five to ten minutes later, one of the missionaries,

---

[97] Sibley, Tr. 17:13-18:1.
[98] Sibley, Tr. 41:6-15.
[99] Sibley, Tr. 21:10-21.
[100] Sibley, Tr. 21:25-22:3.

Sarah, came out and said that A.S. was able to tell her that she had been raped and that it was the French student from LSU.[101]

125.  Although Fr. Sibley did not know the French student from LSU's name or his exact status, he knew who she was referring to because d'Espalungue had been in a talk given by Fr. Sibley earlier that day.[102]

126.  When he returned to the snack room to get more details, A.S. had calmed down some and although she was hesitant to discuss details, she did share directly with him that: it was "Edouard" and that he had made advances, that she said "NO" and that he pinned her down and raped her anyway. She also shared with him that this had occurred behind the activity building near a dock that went out into a lake where there were paddle boats.[103]

127.  Fr. Sibley called 911 around 2:00 a.m. and was routed to the Rapides Parish Sheriff's Department. Two sheriff's deputies from the RPSO arrived about 45 minutes later and Fr. Sibley met them outside the snack room and then accompanied the two deputies into the room where A.S. was still being attended to by the two female missionaries.

128.  By the time the sheriff's deputies arrived and walked into the room, A.S.'s demeanor had changed from hysteria to very childlike, giggly, laughing and joking. He noted that to the untrained this would seem strange; however, based on his experience and interactions with other trauma victims and their professional counselors he recognized that she was "dissociating" (a protective mechanism in the mind and psyche to deal with trauma).[104]

---

[101] Sibley, Tr. 23:12.
[102] Sibley, Tr. 23:10-20.
[103] Sibley, Tr. 23:21-25:18.
[104] Sibley, Tr. 26:6-27:6. Sheila Zepernick (LCSW, EMDR therapist and Certified Spiritual Director) also reviewed the RSPO body cam video of A.S. from the evening of the incident and explains this "psychological coping mechanism" and how it would have been an expected or typical response which the officers misunderstood. Zepernick, Tr. 214:1-21.

129. Fr. Sibley stayed in the room with A.S. and the two deputies for most of the time that they were with her and specifically recalled that the older of the two deputies, Corporal Webb, actively dissuaded her from doing a rape kit because the testing procedure was very invasive, very uncomfortable, and she would have to go downtown to the sheriff's department. In Fr. Sibley's words, Corporal Webb had a very negative attitude toward going forward with the rape kit.[105]

130. The deputies were then led by Fr. Sibley to the cabin (bunkroom) where Edouard was staying and found him in his bunk. They woke him and brought him to another building for questioning. After about 20-30 minutes they handcuffed d'Espalungue and brought him to the squad car.[106]

131. At this point the Sheriff deputies returned to the snack room where A.S. was still accompanied by the two female missionaries and had another round of conversations with her about the rape kit. However, during this follow up, Fr. Sibley recalled the deputies telling A.S. that the rape kit was pointless because of what Edouard had admitted to having sex when they questioned him.[107]

132. Nonetheless, before the deputies departed, Fr. Sibley made sure they were aware that at the time of the rape, A.S. was on her period and was wearing a tampon. He also made certain to

---

[105] Sibley, Tr. 27:12-28:24.

[106] Sibley, Tr. 29:2-19.

[107] Det. Cainan Baker in fact testified that based upon his personal review of Corporal Webb's body cam video of discussions with A.S., she had in fact been told by the deputies that a rape kit was not necessary because Edouard had admitted to having sex with her, and that is all the rape kit would show. Baker, Tr. 56:9-17. Det. Baker also confirmed that prior to telling A.S. that she did not need the rape kit, Corporal Webb had in fact attempted to dissuade her from having a rape kit performed by telling her that the process would take hours, would be extremely invasive and how they would go over every inch of her body. Baker, Tr. 57:18-58:2.

point out to them that she had not removed her tampon and that it potentially had semen on it so it should be preserved as evidence.[108]

133. A.S. was scheduled to complete her undergraduate studies and graduate for ULL in May of 2019 (B.S. Psychology with Minor in Child and Family Studies), so all of this was taking place at the same time she was required to complete and submit an application of admission into ULL's master's program in mental health counseling. It was Fr. Sibley's assessment and observation that the protracted criminal process was affecting her ability to focus and causing her to have added difficulties dealing with the after effects of the rape.

134. When asked what qualities A.S. had that would have made her a good counselor, Fr. Sibley explained that knowing her personal history, her dream of being a play therapist would have been a way for her to be able to help others; particularly, those who had gone through sexual trauma when they were children.

135. He also noted that A.S. was highly intelligent, a very amicable person to talk to, that people were drawn to her, she had a massive heart, a love for children, a very joyful spirit and a creative and playful personality. Thus, he had been very supportive of her desire to specialize in this form of therapy.[109]

136. In the spring of 2019, approximately six months after the rape, Fr. Sibley received a phone call from A.S. advising that she had been admitted to a psychiatric unit because she was having several mental distresses.[110]

---

[108] Sibley, Tr. 30:7-19.
[109] Sibley, Tr. 39:17-40:12.
[110] A.S. had been admitted to a psychiatric hospital for intensive treatment pursuant to a PEC (Physician's Emergency Certificate) due to depression and suicidal ideations with recurrent bouts of self-mutilation and multiple cuts on her hip in various stages of healing. A.S. underwent 5 days of in-patient treatment from March 28 through April 2, 2019 for passive death wishes, guilt and self-deprecation. During this admission she was quoted as saying that "if God told her this was the end of her life, she would be ok with it." P29-002-007 (Under Seal).

137. When he went to visit her there, she explained that her despair and anxiety came not only from the rape itself but also from the criminal prosecution of d'Espalungue and the fact that it seemed there was no a real interest in giving justice to her.[111]

138. Sadly, due to her anxiety and her anger and frustration at God, she has also been spiritually affected. She was unable to come to church at all for a period of time and continues to struggle with the impacts of this rape on her spiritual life.[112]

139. After the rape, Fr. Sibley described a noticeable change in A.S.'s disposition and that her frequency of attending mass daily became sporadic. A.S. continued to reach out to Fr. Sibley for guidance and direction but he described their interactions as being very different.[113]

140. Over the ~2.5 years between the date of the rape and the date on which Edouard d'Espalungue was indicted by the Grand Jury, Fr. Sibley observed the toll that the criminal prosecution was having on A.S. He noted that while she had made some progress in therapy, she was struggling in school and actually dropped out. He also described how she was experiencing depression, spiritual darkness and dryness, a lot of anger at the system, despair and questioning God as to "why is this happening".[114]

141. Unfortunately, because of the pressure she was going through she became mentally and emotionally unable to keep it all together and pursue this career, she dropped out of graduate school and now works as a dance instructor and Pilates trainer.

142. Her parents, J.S. and D.S. have four children (3 girls, 1 boy) and A.S. is their youngest child. They described her as being a very loveable, playful child who loved Dalmatians, got

---

[111] Sibley, Tr. 38:21-39:3.
[112] Sibley, Tr. 40:2-41:5.
[113] Sibley, Tr. 31:10-23.
[114] Sibley, Tr. 33:13-34:20; 40:18-42:16.

along well with her siblings, did well in school, loved dance and never gave them any behavioral problems.[115]

143. All four of their children were raised in the Catholic faith and made holy sacraments.[116]

144. A.S. thrived in H.S. and got involved in campus youth ministries and very involved in church. She got her father involved in the campus ministry and together they attended a few retreats and made mission trips together, including one in Puerto Rico.[117]

145. J.S. and his daughter had planned to continue doing these type things together, but have not done any of these things since the incident nor do they have plans of doing any in the future.[118]

146. According to J.S. and D.S., their ability to enjoy a parental relationship with their youngest daughter has changed drastically since the moment they received a call from her on the morning after the incident and the missionaries brought her home on Sunday.[119]

147. This entire incident has placed a significant burden on her J.S. and D.S.'s ability to have any semblance of the parental relationship they had had and expected to have in the future with their youngest daughter.[120]

148. Her parents observed that A.S. is very depressed, keeps to herself, does not reach out to them or discuss issues with them. When she does spend time with them, it is usually very brief and always tense and strained because everyone is extremely careful and cautious about what to say or not say, questions to ask or not ask, topics to avoid and whether to even talk to her for fear

---

[115] D.S., Tr. 165:8-166:25; J.S., 186:1-188:11.
[116] D.S., Tr. 166:17.
[117] J.S., Tr. 188:15-189:24.
[118] J.S., Tr. 190:12-25.
[119] D.S., Tr. 168:22.
[120] D.S., Tr. 180:21-24.

that it might trigger her anguish/distress. Consequently, they often sit in silence with uncomfortable dead air.[121]

149. According to D.S., it's like an elephant in the room that has to be approached cautiously and carefully and it happens on a regular basis.[122]

150. In the final analysis, the future that J.S. and D.S. planned to have with their daughter included a Master's degree she worked so hard to achieve, a career she dreamed of as a counsellor and the hope that she would marry and a have family; instead, the three of them linger in a very dark place.[123]

151. D.S. presented a medical expense summary totaling $24,687.42.[124]

152. The extended course of the criminal proceedings in the 9th JDC and maneuvers by d'Espalungue caused A.S. to experience severe emotional distress with renewed anxiety and grief with each new notice or request for her to appear.[125]

153. Fr. Sibley travelled with A.S to Rapides Parish to meet with the investigators and prosecutors on multiple occasions and eventually to testify to the grand jury. He would often accompany her to these meetings/interviews just to be supportive and to help her to cope with the emotional strain and disruption those proceedings were having on her ability to function.   Fr. Sibley recalls the frustration and emotional impact on A.S. of the grand jury hearing being scheduled and then cancelled four or five times.[126]

---

[121] D.S., Tr. 177:6-16.
[122] D.S., Tr. 174:16-175:7.
[123] D.S., Tr. 180:25-181:5; J.S., 197:16-24.
[124] D.S., Tr. 181:9-25, (R.Doc. 24-20, P15).  This list did not include charges by LPC, Babb for 59 visits totaling $8,400.00. Babb, Tr. 141:2-14 (R. Doc 24-5, P16).
[125] Sibley, Tr. 41:1-5.
[126] The fact that a grand jury hearing was scheduled and then postponed four or five times is also confirmed by Detective Baker (Tr. 77:19-25).  He too testified that despite the anxiety and stress of all this scheduling and

154. Because of the way this prosecution was dragging on, the negative impact it was having on A.S. and his own personal frustrations about the process, he called the Attorney General to complain. In his view, it appeared that nothing was being done about this rape and he asked whether there was anything the AG could do to encourage the prosecutors to take action.

155. Within a relatively short time after Fr. Sibley complained to the Attorney General, charges against Edouard were finally presented to a grand jury in Rapides Parish on February 23, 2021, who returned an Indictment against him for committing the offense of "Third Degree Rape" in violation of LA R.S. 14:43.[127]

156. Plaintiffs introduced extensive excerpts from those criminal proceedings which include: motions for preliminary examination of the victim by d'Espalungue's counsel, multiple notices of bond proceedings in Rapides Parish, three or four separate motions and orders granting d'Espalungue permission to travel to other states outside of Louisiana for weekend visits with friends (while out on bond), and an order granting his request for permission to travel to France for Christmas 2020 (which required the return of his passport).[128]

157. D'Espalungue, who was required to return to Louisiana in January of 2021, did not return and continues to be on the lam in France. As reflected in d'Espalungue's bond revocation hearing, France refuses to extradite its citizens to the United States for prosecution. Thus, even though d'Espalungue's bond has been revoked and there is an international warrant for his arrest, he continues to be a fugitive from justice and there can be no closure of the criminal proceeding for A.S.

---

rescheduling, A.S. never wavered about going forward with pressing criminal charges against d'Espalungue (Baker, Tr. 78:11-13).
[127] R.Doc. 24-3, P7. 2 years, 4 months and 24 days after the initial arrest.
[128] R. Doc. 24-3, P7 (*in globo*).

**DAMAGES**

158. Plaintiffs presented testimony from two licensed professional counselors and a certified spiritual director (who is also an EMDR Certified therapist). These three professionals combined conducted over 100 counselling/therapy sessions with A.S. since the sexual assault at Tall Timbers.[129]

159. Their collective testimony confirmed that:

> Prior to the rape, A.S. had a calling to be a Licensed Professional Counselor, a Play Therapist who could work with children processing trauma, and an EMDR specialist. Between her spiritual faith, her compassion for others, her innate empathy and her high degree of intelligence, A.S. was full of promise. She had a very bright future and would have become therapist.[130]

Elizabeth Baumer Declaration[131]

160. Elizabeth Baumer (M.S., LPC), a Licensed Professional Counsellor, holds a master's degree in Counselor Education from ULL with a specialty certification in EMDR (Eye Movement Desensitization Reprocessing) Therapy for treatment of trauma and sexual assault victims with Post Traumatic Stress Disorder (PTSD).[132]

161. Between November 30, 2018 and September 17, 2020, Ms. Baumer saw A.S. a total of 56 times (majority were 90-minute sessions) and diagnosed her as having Chronic PTSD-Complex, as well as, depression and anxiety.[133]

162. EMDR therapy is an emotionally draining and physically exhausting protocol which forces victims to reprocess all the layers of trauma in their life. This had to be done in small

---

[129] Elizabeth Baumer (M.S., LPC, EMDR therapist), Marielle Babb (LPC) and Sheila Zepernick (B.S, MSW, EMDR therapist, Certified Spiritual Director).
[130] Baumer, P16-004, para. 18 b.
[131] R. Doc. 24-5, P16.
[132] EMDR therapy is considered the "gold standard" for treatment of emotional and sensory-related memories that come from traumatic experiences. (Babb, P17-021:5-12).
[133] Baumer, P16-003, para. 13.

segments with A.S. because she would be triggered to the trauma itself (dissociate) and have to stop.[134]

163. At the time of her initial visit with Ms. Baumer on November 30, 2018, A.S. was experiencing waking in the middle of the night with nightmares and a drastically affected sleep pattern with terminal insomnia (waking up early despite lack of sleep) and she was dealing with depression and a lot of anxiety about the assault.[135]

164. At her initial visit with Ms. Baumer, A.S. recounted vivid recollections of fear and terror from the night of the rape, including how he had pinned her hair against the bench, lifted her several times into different positions and how she feared he might throw her in the lake and drown her. Despite A.S.'s attempts to persuade him to stop by telling him she needed to go to take medicine, that she was on her period and wearing a tampon he raped her as she pleaded with him to stop while crying and trembling. She will never forget the sight of the treetops above her.[136]

165. Her inability to focus and concentrate because of her PTSD was further amplified by the recurring need for her involvement in the criminal proceedings against d'Espalungue in Rapides Parish.

166. By late fall 2019/early spring 2020, A.S. was so traumatized by lack of sleep, overwhelmed by unwarranted shame and loss of self-esteem and in so much emotional turmoil that she could no longer continue with the academic and self-assessment requirements of the ULL Master's in Counselling Education program.

---

[134] Baumer, P16-003, para. 12.
[135] Baumer, P16-002, para. 7-8.
[136] Baumer, P16-002, para. 9.

167. She warned her professors that the demands of the criminal prosecution might require her to miss some class or otherwise distract. The head of the Dept. of Counselor Education, Irv Esters, PhD, LPC-S, who also served as her Advisor, and Graduate Coordinator encouraged her to take some time away from the rigors of graduate school.[137]

168. She resisted taking a Leave of Absence through her first semester of grad school (Fall 2019) and ultimately in spring of 2020 (a few weeks into her second semester) she could no longer manage the stress of classes and demands of a graduate assistantship with the effects of the trauma and ongoing criminal and civil proceedings. She informed Dr. Esters that she was emotionally spent and agreed to request a Leave of Absence. Dr. Esters submitted her request to the university on February 20, 2020.[138]

169. Due to A.S.'s mental health status, her state of well-being and the ongoing legal process, Ms. Baumer submitted a letter to ULL in support of A.S.'s request for a Leave of Absence from the program.[139]

170. Ultimately, the combined demands of the master's program and the criminal prosecution became too much for her to handle and A.S. had to withdraw from the very educational process that could potentially have been provided some healing of old trauma.

171. Ms. Baumer opined that this assault shattered A.S.'s academic career and the opportunity for healing through cohort Group Processes in the UL counselling education program have likely been lost. The only realistic chance for her to improve is if she can return to EMDR therapy.[140]

---

[137] A.S. Tr. 143:2-22.
[138] R. Doc. 24-6, Declaration, Esters, P18-027.
[139] Baumer, P16-003, para. 14-16.
[140] Baumer, P16-004, para. 18 c.

172. Total charges for the 56 therapy sessions with Ms. Baumer are $8,400 and were necessitated by the rape of September 2018.[141]

173. She has not returned to school and personally does not feel that she has what it takes to be a counselor anymore.[142]

174. All things considered; it is highly likely that A.S.'s on-going healing process will require at least 8-10 years of EMDR therapy.[143]

Marielle Babb: Sworn Video Statement[144]

175. Marielle Babb (LPC) is a Licensed Professional Counselor with a practice focused on treating trauma and sexual assault victims who treated A.S from March 2021 to present.

176. Marielle Babb is a Licensed Professional Counselor with a practice focused on treating trauma and sexual assault victims and has treated A.S from March 9, 2021 to present.[145]

177. Ms. Babb's expertise is in field of mental health counseling and treatment of long-term impacts of sexual assault victimization.[146]

178. Ms. Babb was confident that A.S. met criterion for PTSD because she had had a traumatic event, with recurrent, involuntary, intrusive, distressing memories, dissociative reactions (when something reminds her of the event, she feels emotionally and psychologically as she felt then) and she also experiences intense prolonged psychological distress with any internal or external cues that symbolize or resemble an aspect of the trauma.[147]

---

[141] Baumer, P16-005, para. 19.
[142] A.S. Tr. 148:17.
[143] Baumer, P16-005, para. 20.
[144] R. Doc. 24-17, P17.
[145] Ms. Babb assumed A.S.'s therapy approximately 2.5 years after the September 29, 2018 sexual assault when Ms. Baumer took medical leave.
[146] Babb, P17-008:2-9.
[147] Babb, P17-012:14-14:04.

179.  Four years later, in September of 2022, Ms. Babb confirmed that A.S. meets six out of seven criteria for PTSD (only need two) and is still experiencing dissociative reactions, prolonged psychological distress and marked psychological reactions to any cues that symbolize or resemble an aspect of the event.[148]

180.  Those six criteria are: persistent negative beliefs about herself or world, persistent distortive cognitions about the cause or consequences of the traumatic event that lead to inappropriate blame, persistent negative emotional state (shame), markedly diminished interest or participation in significant activities, feelings of detachment or estrangement from others, persistent inability to experience positive emotions (pushes others away).[149]

181.  Presently her primary PTSD presentation is avoidance (intense efforts to avoid talking about it)[150] with involuntary urges to react by outburst or anger.[151]

182.  To this day, A.S. continues to wrestle with intense shame, a sense of failure, reckless or self-destructive behavior, consistent difficulty with concentration and ongoing significant sleep disturbances.[152]

183.  Her symptoms, issues and avoidance strategies are typical for victims of sexual assault.[153]

184.  Ms. Babb explained that trauma builds upon trauma in layers and cannot be separated. Like the other counsellors, Ms. Babb, explained that these layers work like glaciers and build from the top only.  Traumatic experiences that happen early in life create a schema (filter) or way

---

[148] Babb, P17-014:9-24.
[149] Babb, P17-015:18-016:17.
[150] Babb, P17-018:22-019:6; P17-019:19-23.
[151] Babb, P17-017:24-018:2.
[152] Babb, P17-018:16-21.
[153] Babb, P17-019:19-23.

we think about and relate to the world and victims then process subsequent trauma with that filter for the rest of their life.[154]

185. Prior unresolved trauma from her childhood had not been processed or resolved which made A.S. more vulnerable, would be expected to make it more difficult for her to recover from the trauma of the 2018 sexual assault and she would be expected to experience enhanced consequences.[155]

186. At present, A.S. has plateaued in her recovery and does not have the emotional bandwidth to dig deeper and go through all the layers to try to process and resolve all of her continuing issues; her primary focus at this point is just on functioning (that's as far as she has been able to get).[156]

187. The frequency of A.S.'s current therapy is once every 3-4 weeks; but in the future she will need to resume EMDR therapy (no less than once per week) which is very emotional and can be destabilizing.[157]

188. EMDR can take as little as 1-2 years to as much as 8-10 years for reprocessing to occur. Because of the multiple layers of unresolved trauma and the severity of her chronic PTSD and her strong psychological avoidance defense mechanism (A.S. still curls up in a ball during sessions), the duration of EMDR therapy needed by A.S. is difficult to predict but probably somewhere in between.[158]

189. Ms. Babb opined that the probability that A.S. will ever be able to recover enough to return to the ULL master's in counsellor education program and become a Licensed Professional

---

[154] Babb, P17-025:20-27:16.
[155] Babb, P17-040:4-14.
[156] Babb, P17-027:17-029:1.
[157] Babb, P17-033:20-34:14.
[158] Babb, P17:034:23-036:8.

Counsellor is very low. Instead, A.S. finds it rewarding to teach dance, work as a Pilates instructor and serve as a private nanny for young children and since she is working on various certifications for this alternate career it is probable that she will not return to the Master's program.[159]

Sheila Zepernick (Live)

190. Sheila Zepernick (B.S., MSW) is a cognitive behavioral therapist, EMDR Certified Therapist, and Certified Spiritual Director who had seen A.S. approximately 12 times as a counselor during her first two years of college in 2016 and 2017. These early sessions with A.S. related to normal issues associated with students transitioning from high school to college.[160] Her assessment of A.S. during this period was that she was emotionally stable and that her ability to function and develop as a young female college student was "pretty normal".[161] During these early sessions in 2015-2016, she and A.S. touched upon the subject of her history of childhood sexual assault (CSA) sporadically, because even then her typical coping mechanism was avoidance.[162]

191. At the request of Fr. Sibley, Ms. Zepernick began seeing A.S. as a spiritual director and companion a short time after the incident at Tall Timbers and continues to see her.[163] She was in 100% agreement with counsellors Baumer and Babb that because issues relating to A.S.'s CSA were unprocessed and unresolved when she was sexually assaulted and rape by d'Espalungue,

[159] Babb, P17-036:9-037:8.
[160] Zepernick, Tr. 208:19-209:7.
[161] Zepernick, Tr. 210:5-9.
[162] Zepernick, Tr. 210:20-25.
[163] Zepernick, Tr. 207:20-208:16.

A.S. had an impaired ability to process additional trauma, was particularly vulnerable and at higher risk of being severely traumatized.[164]

192. In her considered opinion, A.S. remains in a high state of trauma, is not sleeping well and presently having a very tough time.[165] She describes her situation as a "Catch-22" predicament in which A.S. needs to go to church and worship service for healing but each time she goes to a holy place and smells incense she is subconsciously taken right back to where it all started. Her ability to worship and seek healing through her once devout faith is damaged as she continues to wrestle with feelings of being unworthy, anger at God, shame and unwarranted self-blame.[166]

193. In her opinion, A.S. has reached a plateau because even though she is doing her ultimate best and has made some progress, she has processed as much as she is able, which is just enough for her to be able to function and barely making it through each day.[167] In her estimation, A.S. will need weekly EMDR therapy for 5-10 years and a lifetime of healing work afterwards (with only the possibility of recovery).[168]

194. The trauma of the sexual assault incident at this retreat and all the recurring steps in the protracted criminal prosecution, as well as, the fact the d'Espalungue absconded to France all represent layers of the same "glacier" which combine to cause A.S.'s current damaged mental status and tortured emotional state.[169]

---

[164] Zepernick, Tr. 212:1-22. *See also* Babb Sworn Statement, R. Doc 24-17 (P17, 23:18-24:7); Baumer Declaration, R. Doc. 24-5 (P16, para. 18. (a)).
[165] Zepernick, Tr. 213: 3; 217:18-21.
[166] Zepernick, Tr. 218:9-219:16.
[167] Zepernick, Tr. 220:1-21; 221:18; 225:2-4.
[168] Zepernick, Tr. 221:10-14; 221:19-222:2
[169] Zepernick, Tr. 223:10-224:2.

195. A.S. remains hypervigilant about not appearing weak or vulnerable which causes her to push her parents away and reject them (typical after rape and sexual assault).  Ms. Zepernick observed that for the first time in four (4) years A.S. allowed her father to put his arm around her (not typical of a 25-year-old girl with parents who love them).[170] This same hypervigilance also causes A.S. to reject potential partners, friends and society in general.[171]

196.  It would have been beneficial to A.S. if she could have continued in the UL counselling education program; instead, she manages to function by spending time with her young dance students because it is comfortable, purposeful, fulfilling and therapeutic for her.[172] In her view, A.S. returning to the UL counsellor education program is only possible IF she gets the healing she needs, returns to her faith, manages to undergo painful EMDR therapy and has the right support system.[173]

197.  The weight of the evidence from professional counsellors (Baumer and Babb) who both completed the same or similar programs, as well as, the head of the ULL counsellor education department (Prof. Esters) concur that is unlikely that A.S. will be able to return to the Master's program. Their testimony collectively confirmed that:

> Trauma builds upon trauma and must be processed in layers.
>
> Until the underlying layers are resolved (glacier analogy) one cannot process new/additional trauma.
>
> A.S. was particularly vulnerable to emotional collapse because of unresolved childhood trauma issues and was at higher risk of extreme reaction and poor adverse results.
>
> The consequences of the rape in September of 2018 have been even more devastating and debilitating and continue to persist.

---

[170] Zepernick, Tr. 225:18-226:4.
[171] Zepernick, Tr. 226:11-23
[172] Zepernick, Tr. 222:16-223:9.
[173] Zepernick, Tr. 229:2-230:11.

> Four years later, A.S. still satisfies the diagnostic criterion for Chronic PTSD-Complex, is not ready to resume EMDR therapy and through no fault of her own, may never have the emotional bandwidth to do so.

> Possible but not probable that she will be able to return to counsellor education program.

198. Plaintiffs also presented testimony in the form of Sworn Declarations from three professors from the ULL Counseling Education program who were familiar with A.S.: Dr. Irvin Esters, PhD, LPC-S, Dr. David Spruill, Ph.D., LPC-S, LMFT-S and Dr. Marc Bourgeois, PhD, LPC-S.[174]

Dr. Irvin Esters

199. Dr. Esters holds a PhD in Counseling and Educational Psychology and serves as Professor and Department Head of the Counselor Education program at ULL.

200. Based upon her academic performance and personal mission statement (P18-021) A.S. was admitted to the UL master's program in the fall of 2019 and was projected to earn her Master's degree in December of 2021.[175]

201. During the fall 2019 semester A.S. went to Dr. Ester's office, was emotional and informed him that she had been the victim of a rape and that there were criminal proceedings pending in Alexandria against the perpetrator and there were court dates approaching.

202. It was his suggestion that she consider taking a leave of absence, but she wanted to continue with her studies. However, he noticed that she seemed disinterested, disengaged, and

---

[174] Esters, R. Doc. 24-6 (P18); Spruill, R. Doc. 24-7 (P19); Bourgeois, R. Doc. 24-8 (P20).
[175] Esters, P18-002, para. 5-6; Spruill, P19-002, para. 12.

emotionally fragile and cried at times, which caused him to have concerns about her ability to continue to engage at the level required of a student in the master's program.[176]

203. During the first several weeks of the Spring 2020 semester, A.S. returned to his office and advised that she was no longer able to handle the pressures of graduate school. He understood and supported her decision and submitted a narrative statement in support of her being granted a Leave of Absence and she has not returned.

204. Dr. Ester's opined that with her history of academic success, he had no doubt that under normal circumstances she would have been fully capable of completing UL Lafayette's Master's program in Counseling.[177]

205. He also confirmed that there is a high demand for mental health counselors and that 100% of graduates from UL's Master's program are normally able to find employment; more specifically, her prospects were particularly good because she expressed a desire to obtain specialty certifications as a Registered Play Therapist and an EMDR-Certified Counselor (Eye Movement Desensitization and Reprocessing) so that she could work with trauma victims in a clinical setting.[178]

206. Based upon his education, training and experience, assuming A.S. had completed her Master's Degree as anticipated in December 2021, Dr. Ester's attested that beginning in January 2022 with a conservative estimate of her projected annual earnings as follows:

> Years 1-3: PLPC (Provisional Licensed Professional Counselor) $40,000-$45,000/year; Years 4-7: LPC (Licensed Professional Counselor Clinical practice) $50,000-$60,000/year; Years 8-15: LPC (Play Therapist, EMDR) (Specialty practice) $70,000-$75,000/year; Years 16-20: (Play Therapist, EMDR) (Specialty practice) $100,000-$125,000/year; Years 21-40: (Play Therapist, EMDR) (Specialty practice) $150-160 per

---

[176] Esters, P18-002, para. 7-8.
[177] Esters, P-18-002, para. 13.
[178] Esters, P-18-002, para. 14-15.

hr. x 6 hrs./day x 5 days/week x 48 weeks/year $216,000 – 230,400 (reduced to $172,800-$184,320/year due to no-shows and rescheduled appointments).[179]

Dr. Marc Bourgeois

207. Dr. Marc Bourgeois holds a PhD in Counselor Education and is an Associate Professor at ULL where he teaches graduate and undergraduate level students. In addition to teaching, he has also been engaged in a solo private practice as a Licensed Professional Counselor since 2010 and supervised Provisional-LPC's as a Board Approved Supervisor (State of Louisiana Board of Examiners).[180]

208. In the spring of 2020, Dr. Bourgeois, taught a master's level group counseling class called "Group Processes" (COUN 509) and specifically recalled A.S. being in his class. The class is divided into two parts with half the class attending his lectures while the other half participates in "T-group" (training group) during which students disclose things about themselves to the group while being video recorded. [181]

209. Dr. Bourgeois was aware that A.S. had been raped, and recalled that as the Spring 2020 semester progressed, she seemed to be getting more emotional and that during one particular training group session she disclosed to the group that a court hearing was coming up and that it was emotionally taxing to her. [182]

210. A few weeks into the semester A.S. came into Dr. Bourgeois' office crying and shared with him that she was struggling with the emotional demands of the program. He encouraged her

---

[179] Esters, P18-002, para. 16-17.
[180] Bourgeois, P20-001, para. 2-4.
[181] Bourgeois, P20-001-2, para. 5.
[182] Bourgeois, P20-001, para. 5-6.

to talk to the Department Head, Dr. Esters, if she didn't feel she could fulfill the requirements of the program at that time.[183]

211. Dr. Bourgeois opined that based on his education, training and experience he had every reason to believe that, but for the emotional distress, A.S. would have successfully completed the Master's program and become a Licensed Professional Counselor.[184]

212. As a Licensed Professional Counselor himself, Dr. Bourgeois charges $150/hr. and but for his full-time teaching position would be able to see 25-30 clients per week, a typical load for LPC's.[185]

213. Finally, he too attested that the post-pandemic demand for mental health counseling services is markedly greater, employment demand for LPC's with specialty certifications such as Registered Play Therapist and EMDR-Certified Counselors is high and that this demand is likely to remain high for the foreseeable future.[186]

ECONOMIC LOSSES

214. Plaintiffs presented the expert opinions and economic loss calculations of a forensic accounting expert, Mr. John W. Theriot, CPA, MACCT, CRFAC, CFF dated October 6, 2022.[187]

215. Mr. Theriot's economic loss projections were based upon the mid-points of earnings potentials provided by Dr. Esters and Dr. Bourgeois, with an appropriate reduction for estimated

---

[183] Bourgeois, P20-001, para. 7.
[184] *Id.* at para. 8.
[185] *Id.* at para. 9.
[186] *Id.* at para. 10-11.
[187] Theriot Declaration and Report, R. Doc. 24-9, P21.

overhead expenses for a self-employed LPC/Play-Therapist;[188] likewise, his report

conservatively adopts the mid-point of A.S.'s future care needs as suggested by Ms. Babb. [189]

216. The Court finds that Mr. Theriot appropriately utilized the statistical information, life

expectancy tables and Bureau of Labor Statistics information listed in his report (P21-007) and

that his methodology resulted in a reliable estimation of the difference between earnings plaintiff

would have received if the harmful event had not occurred.

217. Likewise, the present value of A.S.'s diminished earning capacity and her anticipated

future medical costs are based upon accurate and applicable assumptions regarding her Life

Expectancy (57.20 years) and Work Life Expectancy (35.52 years).

218. Finding that Mr. Theriot's Economic Damages Report is reliably premised on factual

assumptions consistent with the weight of the evidence presented, the court makes the following

other economic loss awards.

PAST MEDICAL EXPENSE

219. Plaintiffs presented evidence that in the 4.03 years between September 30, 2018-October

12, 2022, they incurred related medical expenses in the amount of $24,687.42;[190] however, this

total did not include EMDR therapy charges from LPC, Elizabeth Baumer of $8,400.00 [191] (and

inadvertently included a duplicate charge of $1,200.00 by Kathryn Doucet). The court finds that

---

[188] Using mid-point annual earnings projections and subtracting a residual earnings capacity of $31,074 per year as a dance instructor; the present value of A.S. future loss of income is $2,014,350. (P21-006).
[189] Theriot, R. Doc. 24-9, P21-002-003-4. Assuming one (1) visit per week ($150) for only 5 years, the discounted value of this medical care is $40,416.00 (P21-004); however, this cost could be as high as $80,000 if the equally likely scenario of more frequent visits and a longer duration of care is necessary.
[190] R. Doc. 24-20, P15.
[191] R. Doc. 24-5, P16, para. 19.

the resulting total of medical expenses incurred by A.S. as of the date of the default hearing is $31,887.42.[192]

FUTURE MEDICAL EXPENSE

220. Plaintiffs presented testimony from three separate professional counselors regarding the frequency and duration of future counselling/therapy reasonably anticipated in the future for A.S. would be weekly and for a duration of between 5 (Babb) and 10 years (Baumer).

221. Plaintiffs' forensic accounting expert Mr. John Theriot based his calculation of the present value of future therapy by adopting the conservative assumption that A.S. would only need weekly EMDR therapy for approximately 5 years, beginning within 1 year from the date of the hearing.[193]

222. Based upon that conservative assumption, the present value of that item of loss would be $40,416.00;[194] however, the court was also presented with the Sworn Declaration of Elizabeth Baumer, who saw A.S. over 50 times and opined that at least 10 years of weekly therapy would be necessary at an average annual cost of $7,800 per year. Thus, the amount necessary to provide for A.S.'s future care would be ~$80,832.00.[195]

223. Since neither Ms. Baumer or Ms. Babb's estimation of the frequency and duration of future care is more likely than the other, the court finds that awarding Plaintiff the present value of one (1) therapy session per week for 7.5 years is appropriate. The present value of adopting a frequency and duration in between those estimates is therefore reasonable and appropriate. The court awards the amount of $60,624.00 for medical care A.S. future medical care.

STUDENT LOAN DEBT

---

[192] The student loan balance and the total past medical expense of $31,887.42 are not included in Mr. Theriot's calculations.
[193] R. Doc. 24-9, P21.
[194] P21-004.
[195] R.Doc. 24-5, P16-005, para. 20.

224. Plaintiffs presented evidence that A.S. pursued and obtained a Bachelor of Science degree in Psychology for the sole purpose of becoming a Licensed Professional Counselor and Certified Play Therapist. A degree which is no longer of commercial value to her, yet she is still obligated to repay her student debt and will have to do so based upon a severely diminished residual earnings capacity. The court concludes that Plaintiff is entitled to recover the full amount of her current loan balance $35,103.87.

PAST WAGE LOSS:

225. A.S. was scheduled to complete her Master's in Counseling Education (Clinical) degree in December of 2021 and but for the trauma inflicted upon her by Defendant, would have become an entry level Licensed Professional Counselor as of January 1, 2022.

226. Plaintiffs submitted Sworn Declarations from Professors Esters/Spruill/Bourgeois and additional support from two professional counselors (Baumer and Babb) outlining the earnings capacity for counselors with A.S. 's background, education and anticipated training.

227. While she can no longer work in her chosen field and command the annual earnings confirmed and projected by the head of ULL's Counselling Education Department (Dr. Esters), she now works three (3) jobs to earn substantially less than an entry level counselor.

228. Plaintiff's Forensic Accounting Expert, Mr. John Theriot, confirmed that her residual earnings capacity from teaching dance, working as a Pilate's instructor and serving as a private nanny for small children is $30,828.00 (before taxes). Dr. Esters then confirmed that an entry level counselor would have earned between $40,000-45,000/year beginning January 1, 2022.

229. Mr. Theriot opined that using a midpoint of $42,500 and subtracting her actual average monthly earnings for the period between her anticipated date of becoming a LPC and the date of the hearing results in a net loss of $3,040.00 which is hereby awarded to A.S. for past wage loss.

## FUTURE WAGE LOSS

230. A.S.'s anticipated annual earnings over the balance of her 35.52-year work life as a professional counselor (and becoming a certified play therapist after 8 years) are outlined in the Sworn Declaration of Professor Irvin Esters[196] and range from an entry level of $42,500/year to $124,992.00.

231. Using mid-points for the ranges of annual income confirmed by Dr. Esters, reduced by a credit for her residual earning capacity, and a deduction for average net overhead expenses for self-employed Play Therapists, Mr. Theriot concluded that the present value of diminished future earning capacity is $2,014,350.00 which amount is hereby awarded to A.S.[197]

## GENERAL DAMAGES

232. Great, even vast, discretion is vested in trial courts in awarding general damages causally related to the fault/negligence of an actor upon another, pursuant to La. Civ. Code art. 2324.1.

233. In PTSD cases, damage awards vary widely, but larger awards are often tied to cases in which the plaintiff experienced physical injuries or "severe" symptoms of PTSD.[198]

234. Ultimately, the facts and circumstances of a particular case dictate the adequacy of quantum, not a "comparison of prior awards in cases with similar medical injuries".[199]

235. As a matter of law, the fact that A.S. was particularly vulnerable to emotional collapse after being sexually assaulted does not impact her ability to fully recover in this case.[200]

---

[196] Esters' Declaration, R. Doc. 24-6, P18.
[197] Economic Damages Report and Summary, R. Doc. 24-9, P21-001-006.
[198] *Lewis v. Team Indus. Servs., Inc.* 2015 WL 4397144 (E.D. La. July 13, 2015).
[199] *Guillot v. Doe*, 879 So.2d 374, 380 (La. App. 3 Cir., 2004). Awards from other court's discussed below.
[200] If a defendant's conduct activates or aggravates a pre-existing condition, he must compensate the victim for the full extent of the aggravation. *Frost v. Carter*, 140 So. 3d 59, 65 (La. App. 4 Cir., 2014).

236.  Prior to this assault she was functioning well and able to cope with any prior frailties and the evidence overwhelmingly supports the conclusion that there is an ease of association between the duty breached by d'Espalungue and the devastating injuries, damages and losses experienced by A.S.

237.  In fact, the court concludes that d'Espalungue's depraved conduct constituted an intentional infliction of emotional distress because it was outrageous, so extreme as to go beyond all possible bounds of decency and was so atrocious that it cannot be intolerable in a civilized community.[201]

238.  The incident at Tall Timbers on September 30, 2018 had and continues to have profound negative effects and continuing impact on A.S.'s mental and emotional health, physical wellbeing and ability to enjoy life; including the following:

> Extreme fear, fright, terror
> Severe mental anguish, emotional distress
> Chronic/terminal insomnia, severely disturbed sleep pattern
> Nightmares, flashbacks, Complex and Chronic PTSD
> Pervasive feelings of shame and self-doubt
> Debilitating anxiety and depression
> Embarrassment, humiliation, aggravation
> Hospitalization, alienation from parents, family and friends
> Disruption of final semester of undergraduate school
> Disruption of first semester of grad school
> Inability to complete master's program
> Inability to feel empathy and compassion for others
> Loss of interest and participation in campus ministries
> Loss of chosen career path and gratification from helping others
> Protracted and recurring but incomplete criminal investigation/prosecution proceedings,
> Increased frequency of mental health assessments and reassessments
> Over 100 counseling sessions to date
> Anticipated prospect of ~250 painful and exhausting future counseling sessions
> Drastically negative impact on enjoyment of life
> Challenges to foundation of her spiritual faith and devotion to God
> Inability to attend worship services

---

[201] *See White v. Monsanto, supra.*

Smell of incense triggers severe anxiety and distress
Avoids church, a usual place for comfort and healing ("Catch 22")
Avoidance of friends, class mates, and other social events
Diminished economic horizons and altered status in society
Curtailment of social activities, family gatherings
Significantly impaired ability to have open and loving relationship with parents.
Loss of desire to marry/have children or raise a family
Negative impact on interpersonal relationships with others
Distrust of potential life partners, co-workers, and employers
Constant fear and worry that she will never be able to heal
Constant anguish that defendant EDD will return to U.S. and harm her or others

For the combined impact and negative effects of these and other elements of general damages described in this opinion the court awards Plaintiff, A.S. in the following amounts:

Past: (Date of incident thru date of hearing)
   (September 30, 2018 thru October 12, 2022)
    (4 yrs.)
            $ 700,000.00
Future: (Date of hearing thru remainder of life)
   (October 13, 2022 thru life expectancy)
    (57.2 years)
            $2,500,000.00

TOTAL COMPENSATORY DAMAGES TO A.S.:     $5,845.005.29

LOSS OF CONSORTIUM (J.S. and D.S.)

239. The court finds that Plaintiffs J.S. and D.S., as parents of A.S., are entitled to assert loss of consortium claims under La. Civ. Code art. 2315 (B) because the evidence confirms that they have and will pervasive past and reasonably anticipated future loss of love, affection, society, companionship, curtailment of family activities and severely diminished ability to have any semblance of a normal parental relationship with their youngest daughter.

240. Loss of consortium awards are fact-specific determinations, decided on a case-by-case basis. Parents must prove a measurable loss of any one or more of the following: (1) loss of love

and affection, (2) loss of society and companionship, (3) loss of performance of material services, (4) loss of financial support, (5) loss of aid and assistance, and/or (6) loss of fidelity.[202]

241.  The evidence presented demonstrated an exceptional disruption to their relationship with their youngest daughter.  As a result of the devastating injuries to their daughter, they no longer attend church together, do not participate in mission/campus ministry work anymore, spend very little time together; and when they do they sit in silence with uncomfortable dead air or engage in cautious conversations for fear of waking the "elephant in the room".

242.  The frustration of constantly being rejected and pushed away by their youngest child (first hug in 4 years) and not being able to help her recover from her tarnished (and potentially lost) hope for happiness and the fear that their daughter may never marry or have a family, along with the reasonable likelihood that this may be as good as it gets, are particularly unique circumstances which merit exceptional damage awards.

243.  For the combined impact and negative effects of these and other elements of damage encompassed by the loss of consortium, society and services claims asserted by these parents, the court awards the following amounts: Past: ($100,000 each parent); Future: ($150,000 each parent).

COMPARABLE AWARDS

244.  No case with facts and circumstances or particular injuries and consequences like this one is reported, but *Doe v Neal,* 2015 WL 3688259 (USDC, WDTX) is of some guidance.[203]  In *Neal*, a police officer stopped a 19-year-old female driver, placed her under arrest, groped her at

---

[202] *Mitchell v. Roy*, 51 So. 3d 153, 167, (La. App. 3 Cir. 11/3/10), *writ denied*, 2010-2695 (La. 1/28/11), 56 So.3d 957; and *Harper v. State ex rel DHH*, 176 So.3d 479, 492 (La. App. 4 Cir. 9/9/15).
[203] This case, in which the court awarded this victim $1,100,000 in compensatory damages and $1,000,000.00 in punitive damages (1:1) can be scaled and measured against the specific losses in this case.

the scene for 3-4 minutes and then followed her home after she posted bond and sexually assaulted her. Plaintiff (Doe) was diagnosed with mild-moderate PTSD with major depression and had to withdraw from a medical assistant program which she was expected to complete about 8 months after incident.

245. The victim in *Neal* was awarded compensatory damages for categories of loss similar to those sustained by A.S. which included past medicals ($1,478.00) and future medicals ($40,000). Her future medicals were based on estimated duration of 3-5 years at an estimated cost of $35,000-$45,000 (the court awarded a mid-point).

246. The victim in *Neal* was expected to graduate from the Medical Assistant's program in June of 2014 at an annual salary of $25,000. However, because of the assault she had to withdraw. The court awarded the Plaintiff in *Neal* lost earnings of $334,000 based the calculations of an economics expert and ordered full payment for re-enrollment fees in the amount of $15,522.00.

247. Under the similar, but comparatively less devastating consequences to the victim in *Neal*, the court awarded general damages for mental anguish, humiliation and fear in the amount of $750,000; however, there is no indication in the *Neal* opinion that this victim had ever had any prior trauma or unresolved issues.[204] Based on the fact that the actions of the police officer in *Neal* were found to be "motivated by evil intent and with a callous indifference to the victim's rights" the court felt that sum of $1,000,000 was adequate and reasonable to punish Neal.

---

[204] There is no evidence in *Neal* that the victim had the same magnitude, pervasive, intrusive or disabling consequences as presented here.

248. In the final analysis, this court concludes that by evaluating and assessing the particular injuries and their severe effects on these particular plaintiffs (especially in light of A.S.'s "particular vulnerability"), *Doe v. Neal* can be scaled accordingly.[205]

249. Likewise, while the defendant's liability in *Neal* was based on conduct which was callously indifferent to the rights of his victim; the premeditated and heinously reprehensible conduct of d'Espalungue based on his sense of royal entitlement, his sadistic pleasure in destroying innocence and his self-declared societal motive to harm young women-of-faith while at a religious retreat, mandate a ratio of 5:1 punitive damages. When the court also considers the fact that d'Espalungue remains on the lam and is fully capable of luring and harming even more young women, the 5:1 ratio of punitive damages so readily approved by the 5th Circuit in *Lewis*, *supra;* would not be inappropriate.

EXEMPLARY DAMAGES

250. La. Civ. Code art. 2315.8 provides for recovery of exemplary damages in cases of "wanton and reckless disregard for the rights and safety of a family or household member, as defined in R.S. 46:2132 [*which now includes a "dating partner"*], through acts of domestic abuse resulting in serious bodily injury or severe emotional and mental distress."[206]

251. The definition of "dating partner" in La. R.S. 46:2151(B) turns on whether there was an "expectation of affectionate involvement" in a "sexual or intimate" relationship.

252. At first blush, it may seem that A.S. should not qualify for the protections of a "dating partner," because she met d'Espalungue less than 30 hours before he raped her. However, the original factors such as length and type of relationship and frequency of interaction (which were

---

[205] *Reck v. Stevens,* 373 So.2d 498 (La. 1974).
[206] Act No. 315 (2014).

to be "factors" in determining whether someone met the definition of "dating partner") were stripped from HB 233 before it passed.[207]

253. The intent of the legislature may be ascertained by examining legislative history of a statute or related legislation.[208]

254. Based upon the legislative history of this statute, removal of these "factors" from the definition of "dating partner" reflects a legislative intent that exemplary damages are available when violence is used in *any* intimate or sexual relationship where an "expectation of affectionate involvement" in a "sexual or intimate" relationship, regardless of frequency or duration.[209]

255. On September 30, 2018, defendant assured A.S. that he was interested in her,[210] that he was "serious about this," that he wouldn't be able to see her for two weeks and he wanted her to

---

[207] The Digest of the reengrossed HB 223 (2017) describes the original language as follows (the "factors" were later stripped from the bill):

> Defines "dating partner", for purposes of the present law Protection from Dating Violence Act (R.S. 46:2151 et seq.), as any person who is or has been in a social relationship of a romantic or intimate nature with the victim and where the existence of such a relationship shall be determined based on a consideration of the following factors: the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship.

Floor amendments to Helena Moreno's original bill were accepted and the Digest of Reengrossed House Bill No. 223 (2017) states:

> (4) Defines "dating partner" as any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. Provides that "dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.

Reengrossed H.B.223, 2017 Leg., Reg. Sess. (La. 2017).

[208] *Fecke v. Board of Supervisors,* 217 So.3d 237 (La. 2016); citing *Theriot v. Midland Risk Ins. Co.,* 694 So.2d 184, 186 (La. 1997).

[209] The definition of "dating partner" is set forth in La. R.S. 46:2151(B):

> B. For purposes of this Section, "dating partner" means any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affectionate involvement independent of financial considerations, regardless of whether the person presently lives or formerly lived in the same residence with the offender. "Dating partner" shall not include a casual relationship or ordinary association between persons in a business or social context.

[210] A.S., Tr. 114:19-25 – 115:1-13.

know he was serious.[211] These facts satisfy the "expectation of affectionate involvement" requirement of the statute.[212]

256. The court's conclusion that there was an "expectation" of an intimate involvement (and thus a "dating partner" relationship) is further confirmed by d'Espalungue's own journal entry in which he states: "I feel the attraction she feels for me."[213]

257. The court finds that exemplary damages under La. RCC art. 2315.8 are awardable in this case because the evidence presented demonstrates that A.S. was involved in a relationship characterized by an expectation of intimacy and therefore satisfies the definition of "dating partner" pursuant to La. R.S. 46:2132 and 46:2151.[214]

258. Although the Supreme Court has not clearly defined the point at which punitive damage awards become excessive, it has provided guidance for the lower courts in assessing punitive damage awards. In *BMW of N. Am. v. Gore*, the Court identified three factors to consider in examining punitive damage awards: "the degree of reprehensibility of the [defendant's conduct]; the disparity between the harm or potential harm suffered by [plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." 517 U.S. 559, 575 (1996).[215]

259. With respect to the ratio of actual damages to punitive damages, the Supreme Court has stated that no "bright-line ratio" exists, but "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm v. Campbell*, 538 U.S. 408, 425 (2003).[216]

---

[211] Baker, Tr. 94:21-25 – 95:1-13.
[212] La. R.S. 46:2151(B)
[213] *See* ¶ 103-6 (above).
[214] A.S. and her parents seek exemplary damages of three time (3:1) their total compensatory damages.
[215] Disparity between damages refers to the ratio between actual damages and punitive damages.
[216] Emphasis supplied.

260. In *Campbell*, *supra,* the Court further stated that in other cases, "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety." *Id.*

261. Finally, the Court explained that there is a 700-year legislative history that demonstrates "what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range" of double and triple digits. *Id.*

262. In *Lewis v. Pugh,* the U.S. 5th Circuit approved a jury award of punitive damage at a ratio of 5:1 over compensatory damages arising from a police officer who raped a woman when he offered to give her a ride home. The court specifically noted it had no difficulty upholding the jury's award because Pugh's conduct, utilizing a position of trust to rape and assault a vulnerable woman, is particularly reprehensible. Second, the ratio between the punitive and compensatory damages in this case is 5:1, a ratio not so disproportionate as to "jar one's constitutional sensibilities."[217]

263. In affirming the punitive award of 5:1 the 5th Circuit pointed to the fact that the comparable criminal sanctions for Pugh's conduct are serious, as indicated by the fact that he was currently serving a 12–year sentence for the rape and assault of Lewis.[218]

264. Considering Defendant's level of depravity, documented premediated intent to inflict extreme emotional, psychological and spiritual harm to this victim and all women like her (at a religious retreat), as well as, false representations to the State of Louisiana to evade criminal prosecution, for a crime punishable by a 25 year prison term, his privileged status as a wealthy

---

[217] *Lewis v. Pugh*, 289 Fed. Appx. 767, 777 (USCA5, 2008). In *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 481, (1993), the U.S. Supreme Court indicated that a ratio between the punitive award and the potential harm of ten to one was not constitutionally infirm.
[218] *Lewis, supra* at 777. Here, d'Espalungue is subject to a sentence of 25 years, IF he can ever be found and prosecuted.

and fugitive from justice, intentional refusal to cooperate with civil authorities and his apparent on-going efforts to lure additional victims via the internet and social media, as well as, his particularly heinous disregard for the rights and privileges of A.S. and her parents (J.S. and D.S.), the court finds that an award of exemplary damages to each plaintiff at a ratio of 3:1 compared to their respective total compensatory damages is appropriate and constitutionally sound.

265. A.S.'s compensatory damages are in excess of $5,000,000; thus, the court awards exemplary damages to her in the amount of $15,000,000.00.

266. J.S. & D.S.'s compensatory damages are $250,000 (each); thus, the court awards exemplary damages in the amount of $750,000.00 to each of them.

## RECOMMENDED JUDGMENT

SPECIAL DAMGES/ECONOMIC LOSSES:

 Loss of Tuition and Enrollment Fees:

  Current Balance on Student Loan    $35,103.87

 A.S. Medical care and expenses

  Past: (4.03 yrs., September 30, 2018-October 12, 2022)

     $31,887.42

  Future: (57.2-year life expectancy)

   (Date of hearing, October 13, 2022 forward) $60,624.00

 Loss of Income/Earnings

  Past: (.78 yrs.) (January 1, 2022 to October 12, 2022)

     $3,040.00

  Future: (35.52 yrs.) (October 13, 2022 to end of work life expectancy)

     $2,014,350.00

  TOTAL SPECIAL DAMAGES:  $2,145,005.29

GENERAL DAMAGES TO A.S.:

Past: (Date of incident thru date of hearing)
           (September 30, 2018 thru October 12, 2022)
                     (4 yrs.)
                                                           $700,000.00

Future: (Date of hearing thru remainder of life)
             (October 13, 2022 thru life expectancy)
                       (57.2 years)
                                                         $2,500,000.00

TOTAL GENERAL DAMAGES TO A.S.:                            $3,200,000.00


LOSS OF CONSORTIUM DAMAGES TO PARENTS:

     Past: (4 years)                          $200,000.00

          ($100,000 each parent)

     Future: (25 years)                       $300,000.00

          ($150,000 each parent)

TOTAL COMPENSATORY DAMAGES:
                                                         $5,845,005.29*

EXEMPLARY DAMAGES:  (3:1)

     A.S.                                     $15,000,000.00

     J.S. and D.S. ($750,000.00 each)          $1,500,000.00


*Plus interest from date of Judicial Demand (February 22, 2021) until paid and all costs.

Respectfully submitted,

**MILDRED E. METHVIN, LLC**
s/ *Mildred E. Methvin*
Mildred E. Methvin (#14619) T.A.
7414 Sardonyx St.
New Orleans, LA 70124
T: 337-501-1055
F: 888-298-0566
Email: memethvin@gmail.com

**DOMENGEAUX, WRIGHT, ROY & EDWARDS, LLC.**

s/ *Elwood C. Stevens, Jr.*
Elwood C. Stevens, Jr. (#12,459)
Jefferson Towers, Suite 500
556 Jefferson Street
Lafayette, LA 70501
T: (337) 233-3033
F: (337) 232-8213
Email: elwoods@wrightroy.com

**ATTORNEYS FOR PLAINTIFFS, JANE DOE, ET AL**