## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**JANE DOE, ET AL**                              **CIVIL DOCKET NO. 6:21-CV-00430**

**VERSUS**                                      **JUDGE DAVID C. JOSEPH**

**EDOUARD d'ESPALUNGUE**              **MAGISTRATE JUDGE CAROL B.**
**d'ARROS**                                     **WHITEHURST**

### MEMORANDUM ORDER

Before the Court is a MOTION FOR EVIDENTIARY HEARING AND FOR DEFAULT

JUDGMENT (the "Motion") [Doc. 14] filed by Plaintiffs, Jane Doe (hereinafter "A.S."),

and her parents, John Doe ("J.S.") and Mary Doe ("D.S.") (collectively, "Plaintiffs").[1]

Plaintiffs request that the Court enter a default judgment against Defendant

Edouard d'Espalungue d'Arros ("Defendant" or "d'Espalungue") finding that he

sexually assaulted A.S. in September of 2018 and award damages.  [Doc. 46].  Based

on representations from Plaintiffs' counsel that they had properly effected service

pursuant to the Hague Convention on the Service Abroad of Judicial and

Extrajudicial Documents (the "Convention" or "Hague Convention"), the Clerk of

Court entered a default in this matter on July 6, 2022.   [Doc. 13].   The Court

subsequently held an evidentiary hearing on the Motion on October 12 - 13, 2022.

For the reasons discussed below, the Court finds that Plaintiffs have failed to properly

---

[1]      Plaintiffs assert that because A.S. is the victim of a sex offense, she is entitled to
confidentiality of her identity pursuant to Article I, § 25 of the Louisiana Constitution, La.
R.S. 46:1841, and La. R.S. 46:1844(W)(1)(a).  [Doc. 1, p. 2].

effect service on the Defendant.  The Motion for Default Judgment is therefore DENIED and the Clerk of Court's Entry of Default [Doc. 13] is VACATED.

## I.   JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as: (i) Plaintiffs are citizens of Louisiana; (ii) the Defendant is a citizen or subject of a foreign state (France) who is not lawfully admitted for permanent residence in the United States; and (iii) the amount in controversy exceeds $75,000 exclusive of interest and costs.  Venue is proper because the assault occurred in the Western District of Louisiana, the Plaintiffs reside in Lafayette, Louisiana, and because the Defendant is a foreign national who may be sued in any judicial district. 28 U.S.C. §1391(c)(3) (a defendant not resident in the United States may be sued in any judicial district).

## II.   PROCEDURAL HISTORY

This matter arises out of a sexual assault that occurred on September 30, 2018, during a church retreat organized by the "Ragin' Cajun Catholics," the college ministry of Our Lady of Wisdom Catholic Church ("OLOW") at the University of Louisiana at Lafayette ("ULL").  [Doc. 46, p. 17].  The retreat was held at a Christian retreat center approximately an hour north of Lafayette in Rapides Parish, Louisiana.  [Doc. 1, p. 4].  The Defendant was arrested that same night by the Rapides Parish Sheriff's Office ("RPSO") on a charge of sexual battery.  [Doc. 12-1, p. 1].  After he was booked, Defendant posted a $25,000 bond and then returned to Baton Rouge where he was a graduate student at Louisiana State University ("LSU").  *Id.*  After

further investigation, the RPSO again arrested the Defendant on October 4, 2018, in Baton Rouge – this time for second-degree rape.[2]  *Id.*  The Defendant posted an additional $75,000 bond, surrendered his passport, and again returned to Baton Rouge.  [Doc. 12-1, p. 2].  On December 14, 2020, the Defendant flew home to France, having received permission from the state district court in Rapides Parish to reclaim his passport and return home for the Christmas holiday.  [Doc. 12-1, p. 2].  The Defendant never returned to the United States.[3]  [Doc. 12-1, p. 2].

On February 22, 2021, Plaintiffs filed a Complaint in this Court seeking to recover monetary damages for the sexual assault pursuant to La. Civ. Code art. 2315. [Doc. 1, p. 7].  Specifically, Plaintiffs seek: (i) special damages, compensatory damages, and punitive damages against Defendant; (ii) all costs and fees associated with this action; and (iii) a protective order against the Defendant.  [Doc. 1, p. 7];

---

[2]   The Defendant was not charged by the Rapides Parish District Attorney until February 23, 2021, when he was indicted by a Louisiana grand jury on a charge of third-degree rape.  [Doc. 46, p. 2].

[3]   It is well known that France does not extradite its citizens. However, after d'Espalungue was indicted, the state court issued a no-bond arrest warrant which is now outstanding.  *Id.*  Subsequently, a "red notice" international arrest warrant was filed with Interpol requesting that law enforcement arrest d'Espalungue should he attempt to travel outside of France.  *Id.*; *see About Red Notices*, INTERPOL, http://www.interpol.int/en/How-we-work/Notices/About-Red-Notices (last visited March 8, 2023).

d'Espalungue allegedly tried to return to the United States on January 8, 2021, but was purportedly prevented by a "U.S. Marshal" who informed him that his visa had been revoked. [Doc. 46, p. 11].  d'Espalungue claimed that he was unaware his visa had been revoked, though LSU revoked his student visa when he was suspended from that school.  [Doc. 46, p. 12].  Plaintiffs allege that this shows d'Espalungue "created an elaborate ruse that he was attempting to return to the United States to face criminal charges but that he was being barred *because he had been arrested*, not because he was trying to fly on a student visa he knew had been revoked."  [Doc. 46, p. 12].

[Doc. 45, p. 13].   Under Louisiana law, "[a] delictual action against a person for any act of sexual assault, as defined in La. R.S. 46:2184, is subject to a liberative prescription period of three years."   La. Civ. Code art. 3496.2; (La. R.S. 46:2184 defines sexual assault as "any nonconsensual sexual contact.").   Prescription begins to run "the day the injury or damage is sustained," which in this case, is September 30, 2018.  *Id.*  As such, this action was timely filed by Plaintiffs.

Because the Defendant absconded to France, Plaintiffs hired "Ancillary Legal Corporation" to translate and serve the Defendant in compliance with the Hague Convention.   [Doc. 6-1, p. 2].   On July 22, 2021, the translated Complaint was delivered to France's Central Authority, the Ministry of Justice.  [Doc. 6-1, p. 2].  More than a year later, on February 28, 2022, the French Ministry of Justice issued an official certification, pursuant to Article 6 of the Convention, that service of process could not be made on the Defendant because the "[r]ecipient did not reply to the request of the Police to appear before them."  [Doc. 12-1, p. 2]; *see* 20 U.S.T. 361, T.I.A.S. 6638, Art. 6.   Specifically, the Certification showed that police officials in France spoke with the Defendant and scheduled three separate meetings for the Defendant to come to the police station to receive service, but that he never appeared.[4]  [Doc. 46, pp. 7-8]; [Doc. 12-2, pp. 9-10, 12, 18]; [Doc. 16, p. 2].

---

[4]     According to the Certification, the police spoke to the Defendant twice by telephone including once on October 21, 2021. *See* [Doc. 12-1, pp. 9-10, 12, 18]; [Doc. 45. p. 8].  Meetings for service of the documents were scheduled for October 26, 2021, November 28, 2021, and February 1, 2022. *Id.*

On June 30, 2022, the Court held a status conference with Plaintiffs' counsel. [Doc. 11]. There, after a discussion and assurances from Plaintiffs' counsel that the requirements for service of process under the Convention had been met, it was determined that counsel for Plaintiffs would file a Motion for Entry of Default followed by a Motion for Default Judgment.[5] [Doc. 11]. The Court also ordered Plaintiffs' counsel to provide the Clerk of Court with all known addresses and email addresses for the Defendant so that the Clerk could apprise him of orders of the Court and any scheduled hearing dates. [Doc. 11]. Moreover, due to the serious nature of the allegations against the Defendant and the fact that Plaintiffs' case is not for a sum certain, the Court instructed Plaintiffs that it would conduct a full evidentiary hearing on the Motion for Default Judgment in order for the Court to establish the truth of the allegations, make factual findings from the evidence, and determine the amount of any damages sustained by Plaintiffs.[6] [Doc. 11].

---

[5]     The Court does not believe that Plaintiffs' counsel intentionally misled the Court, but rather that they misapprehended the service requirements of the Hague Convention. Regardless of the cause, because of counsel's erroneous representation that they had properly effected service, the Court has expended a considerable amount of time conducting the evidentiary hearing, reviewing evidence, and researching issues of federal and state law. But much more concerning is that A.S. and her family were subjected to the emotional ordeal of testifying in federal court about this extremely traumatic and personal event in her life – all to no effect. Undersigned is acutely aware of the courage and emotional energy it takes for survivors of sexual assault to testify in court about their experiences.

[6]     In cases where a plaintiff's claim is not for a sum certain, "the party must apply to the court for a default judgment. Fed. R. Civ. P. 55(b)(2). The court "may conduct hearings … when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2).

On July 6, 2022, Plaintiffs' counsel submitted a sworn affidavit attesting to service and requesting that the clerk enter default against the Defendant.  [Doc. 12-1].  The Clerk of Court entered a default against Defendant that same day.  [Doc. 13].  On July 12, 2022, Plaintiffs filed the instant Motion seeking a default judgment against the Defendant.  [Doc. 14].[7]

The Court held an evidentiary hearing on October 12 - 13, 2022.  At the hearing, the Court took documentary and testimonial evidence from the Plaintiffs, including the testimony of A.S. and the witnesses called by her, including: (i) former Ragin' Cajun Catholics director Father Bryce Sibley ("Father Sibley"); (ii) a detective formerly assigned to the case, Detective Cainan Baker; (iii) her mother D.S.; (iv) her father J.S.; and (v) her spiritual advisor Shelia Zepernick.  [Doc. 23].  At the close of the hearing the Court informed Plaintiffs that the matter would be taken under advisement and ordered Plaintiffs to submit proposed Findings of Fact and

---

[7]      In accordance with the Court's direction, Plaintiffs also filed a MOTION FOR EX PARTE ORDER DIRECTING CLERK OF COURT TO MAIL COPIES OF DEFAULT AND ORDER SETTING EVIDENTIARY HEARING TO DEFENDANT VIA INTERNATIONAL REGISTERED MAIL.  [Doc. 16]. Plaintiffs included two addresses "utilized by the Defendant within the last year" in France in their Motion.  [Doc. 16].  The Order to Serve was entered on July 18, 2022, by the Magistrate Judge, directing the Clerk of Court to mail copies of the documents to the Defendant.  [Doc. 17].  The Clerk mailed the documents the next day to both addresses provided by Plaintiffs via International Registered Mail.  [Doc. 18].  The envelope mailed to the first address attributed to Defendant was marked unclaimed and returned on September 26, 2022.  [Doc. 46, p. 10]; see also [Doc. 19] (envelope marked "Pli avisé et non réclamé"). The envelope mailed to the second address attributed to Defendant was marked unclaimed and returned on October 26, 2022.  [Doc. 46, p. 10]; see also [Doc. 25] (envelope marked "Pli avisé et non reclamé").  Additionally, Plaintiffs emailed copies of the pleadings to two email addresses known to have been used by Defendant, and to the email address of Pierre Hourcade, whom Plaintiffs believe is Defendant's attorney in Paris.  [Doc. 24-10, p. 24]; [Doc. 24-15, p. 31].  No responses have been received.

Conclusions of Law, which, after more than six months of delays and requested extensions, was finally submitted to the Court on April 21, 2023.  [Doc. 46].

## III.   EVIDENTIARY HEARING

The facts elicited at the evidentiary hearing are as follows.  On September 28, 2018, the Ragin' Cajun Catholics began their annual "Encounter Weekend" retreat. [Doc. 46, p. 17].  A.S., then a 21-year-old senior at ULL, and Defendant, d'Espalungue, then a 28-year-old French graduate student at LSU, both attended.  [Doc. 46, p. 17]; [Doc. 1, p. 4].  A.S. had been involved with Ragin' Cajun Catholics since her freshman year at ULL.  [Doc. 28, p. 20]; [Doc. 28, pp. 107-109].  Though she had attended previous Encounter Weekends, this was the first time that she planned to stay through the whole weekend.  *Id.*  d'Espalungue was invited to attend the retreat by his then 18-year-old girlfriend, who was a freshman at ULL and also a member of the Ragin' Cajun Catholics.  [Doc. 46, p. 4].

### A.   *Testimony of A.S.*

A.S. testified that she met d'Espalungue the first night of the retreat when she briefly introduced herself to him.  [Doc. 28, p. 109].  Throughout the next day, A.S and d'Espalungue continued to interact.  [Doc. 28, p. 109].  Among other interactions, A.S invited d'Espalungue to go on a hike and taught him to Cajun dance.  *Id.*

While sitting around a bonfire on Saturday night, A.S. and d'Espalungue began to talk.  [Doc. 28, p. 112].  When a group of campers at the bonfire began to sing, d'Espalungue asked A.S. if she wanted to go for a walk so they could continue their conversation away from the noise.  *Id.*  While walking, d'Espalungue began to ask

A.S questions related to the retreat and relationships.   [Doc. 28, p. 113].   They eventually reached the dock of a small lake where the two sat on a bench and continued to discuss relationships.   [Doc. 28, p. 115].   At that point, A.S stated that d'Espalungue admitted he had feelings for her.   [Doc. 28, p. 115].   Then, in the middle of a sentence, d'Espalungue kissed A.S., and repeatedly emphasized that he "had" to kiss A.S. so she would know he was "serious about her."   [Doc. 28, p. 115].   A.S. testified that she originally consented to the kiss, but after a few seconds, wanted to stop and pulled away.   *Id.*

But d'Espalungue did not stop.   Instead, A.S testified that although she pulled away and no longer responded to d'Espalungue's advances, he continued to kiss A.S. and started to aggressively put his hands on her.   [Doc. 28, p. 115].   d'Espalungue then began to put his hands down A.S.'s leggings and told her that it was "difficult for him to abstain from sex."   *Id.*   At the same time, A.S. was telling him to stop and saying, "I don't want to do this," and "we're going to get in trouble."   *Id.*   As A.S. continued to attempt to move d'Espalungue's hands, he straddled her and pinned her hands behind her head.   [Doc. 28, p. 116].   A.S. testified that she then made a conscious decision to escape so she could "get out and this [could] be over."   But when she attempted to lift her head and escape, her hair was trapped between the bench and d'Espalungue's arm.   [Doc. 28, pp. 116-117].   At this point, A.S. testified that she was afraid of what d'Espalungue would do to her if she attempted to fight back.   *Id.*

A.S. eventually succeeded in getting away from the Defendant by telling him that she needed to leave to take medicine.   [Doc. 28, p. 117].   Once they got up and

began to walk, however, d'Espalungue threw A.S. on the ground and pinned her hands above her head, all the while A.S. was crying, shaking, and repeatedly saying "no," and "stop."  *Id.*  d'Espalungue then pulled A.S.'s leggings down and forcibly penetrated her.  *Id.*  About a minute or two later, d'Espalungue stood up – leaving A.S. on the ground with her leggings and underwear at her knees.  *Id.*  When A.S. was able to stand up, she noticed a clear substance on the back of her leggings.  *Id.* When asked about it, d'Espalungue claimed that the substance wasn't his because he did not ejaculate.  *Id.*

A.S. then made her way to the camp's activity center.  [Doc. 28, pp. 119-120]. A.S. testified that d'Espalungue followed her to the door, though she repeatedly asked him not to walk with her or go in.  [Doc. 28, pp. 119-120].  Once inside, A.S. made eye contact with her friend, J.B., and the two of them went into the snack room where A.S. immediately began to cry and "curled up into a ball."  [Doc. 28, p. 120].  The Court found A.S.'s testimony to be credible and supported by the available direct and circumstantial evidence.

B.  *Testimony of Father Sibley*

Father Sibley testified that he received a call around 1:00 a.m. on September 30, 2018, that there was a student in the activity center in an emotional state.  [Doc. 28, p. 21].  When he arrived, he saw A.S. on the ground "almost in a fetal position in complete and utter hysterics, screaming, yelling, and wailing back and forth."  [Doc. 28, p. 21].  When A.S. calmed down enough to explain what had happened, Father Sibley called 911.  [Doc. 28, p. 21].

Corporal Clayton Webb and another Deputy Sheriff from the RPSO arrived around 1:30 a.m. and interviewed A.S., who was able to recount to them the events that had transpired.  [Doc. 28, p. 54].  Once the deputies had finished their initial interview with A.S., Father Sibley led them to the cabin where d'Espalungue was staying.  [Doc. 28, p. 29].

Father Sibley testified that by the time the Sheriff's deputies returned to the snack room after interviewing d'Espalungue, they had determined that conducting a rape kit on A.S. would not be beneficial to the investigation since d'Espalungue admitted to having sexual intercourse with A.S.  *Id.*  The deputies did, however, collect the clothes A.S. was wearing and took a tampon that A.S. had removed from her body.  The Court found Father Sibley's testimony to be credible and supported by the available direct and circumstantial evidence.

C.  *Testimony of Detective Cainan Baker*

The Court also heard testimony from Detective Cainan Baker, the detective from the Rapides Parish Sheriff's Office assigned to the case.  Detective Baker testified that the body camera video from d'Espalungue's interview with the two responding deputies demonstrated that he appeared evasive and tried to "dodge questions with technicalities," but that he eventually admitted to having sex with A.S. and claimed it was consensual because "she did not resist."  [Doc. 28, p. 61].  At this point, the responding deputies handcuffed d'Espalungue and brought him to the squad car.  [Doc. 28, p. 29].

Detective Baker also testified as to the investigatory steps undertaken to confirm A.S.'s account of the events of that night.  Specifically, he testified that, among other measures, he:

(i)     conducted multiple witness interviews;

(ii)    reviewed the body camera video from A.S. and d'Espalungue on the night of the incident;

(iii)   ordered and reviewed a DNA test confirming that the substance on A.S.'s leggings was semen containing d'Espalungue's DNA;

(iv)    reviewed relevant inculpatory messages found on d'Espalungue's cell phone and in his diary; and

(v)     considered other physical evidence gathered in the case, including the tampon removed from A.S.[8]

Detective Baker also noted that his conclusion was supported by the fact that A.S.'s account of the relevant events did not change throughout numerous interviews and because he was unable to find a motive for her to fabricate her story or otherwise not tell the truth.  [Doc. 28, pp. 76-77].

At the conclusion of his investigation, Detective Baker determined there was probable cause that d'Espalungue had sexually assaulted A.S.  [Doc. 28, pp. 87-90].

---

[8]     Detective Baker testified that it took approximately 15 minutes and the assistance of two other females to remove the tampon from A.S.  [Doc. 28, p. 57].  The tampon was then given to the deputies who put it in a sealed plastic bag.  *Id.*  According to Detective Baker, the tampon was not sent for testing in the lab because storing it in a sealed plastic bag destroyed any DNA evidentiary value.  *Id.*  He noted, however, that he considered the fact that the tampon had been pushed so far into Plaintiff's body that it took approximately 15 minutes to remove and required the assistance of the two Ragin' Cajun Catholics' staff members, as evidence of non-consensual penetration.  [Doc. 28, pp. 84, 90].

The Court found the testimony of Detective Baker to be credible and further found that he conducted a professional and thorough investigation into this matter.

    D. _The Aftermath and Resulting Damages_

After the sexual assault, A.S. suffered severe mental trauma which impacted her personal life as well as her education. [Doc. 28, pp. 140-143]. With the upcoming presentation of her case by the district attorney to the Rapides Parish grand jury, A.S. was distracted in school.[9] [Doc. 28, p. 142]. Despite encouragement from a professor to take a leave of absence, A.S. continued her final two semesters of her undergraduate education and received a bachelor's degree. [Doc. 28, pp. 141-142]. During this time, A.S. also applied and was accepted into graduate school. _Id._ In April 2019, however, A.S. was admitted to a psychiatric unit where she was diagnosed with PTSD, anxiety, and depression. [Doc. 28, pp. 137-138]. A few months after beginning her first semester of graduate school, A.S. filed a leave of absence for medical reasons noting that she was "under treatment for PTSD and general anxiety, after being sexually assaulted in September 2018, and was still undergoing legal proceedings." [Doc. 28, p. 145].

Father Sibley, who first met A.S. when she was a freshman at ULL and served as her pastor and spiritual director during her four years at ULL, testified that the sexual assault had a clear and profound mental, emotional, and spiritual effect on A.S. [Doc. 28, p. 34]. A.S.'s previously frequent attendance and involvement in the

---

[9]    Plaintiff was asked to testify before the grand jury in the criminal case. _See_ [Doc. 28, p. 136]. Plaintiff originally prepared to testify before the grand jury in early 2020, but the case was re-scheduled several times before she finally testified. _Id._

Ragin' Cajun Catholic events became "sporadic," and he noticed that she seemed to be experiencing depression, "spiritual darkness," and anger. *Id.* Though A.S. was less involved with the Ragin' Cajun Catholics, she still sought Father Sibley's guidance and asked him to accompany her to numerous interviews with Detective Baker. [Doc. 28, pp. 31-32, 38].

A.S.'s parents described her as a playful, loving child who did well in school and "never gave them any trouble." [Doc. 28, pp. 165-166, 186]. Her parents testified that A.S., as well as their relationship with her, has changed drastically since the sexual assault. A.S.'s parents feel as if their interactions are now brief and strained because they fear upsetting A.S. [Doc. 28, p. 177]. J.S. testified that before the assault he and A.S. went to church together and attended mission trips together, but that their interactions are now infrequent and awkward. [Doc. 28, pp. 189-190].

A.S.'s two licensed professional counselors and her certified spiritual director also testified at the hearing. All three agree that A.S. was particularly mentally and emotionally vulnerable because of unresolved childhood trauma. Each of them also agreed that the consequences of the September 2018 sexual assault persist. [Doc. 46, p. 39]. They testified that it will take between five and ten years of therapy for A.S. to fully process her sexual assault. [Doc. 46, pp. 42, 44, 46].

Specifically, Sheila Zepernick ("Zepernick"), a cognitive behavioral therapist and a certified spiritual director, saw A.S. approximately 12 times as a counselor during her first two years of college in 2016 and 2017. [Doc. 29, p. 11]. At the request of Father Sibley, Zepernick began seeing A.S. as a spiritual director and companion

after the incident and continues to see her.  [Doc. 29, p. 10].  Zepernick testified that during their early sessions in 2016 and 2017, A.S. was emotionally stable and testified that A.S.'s ability to function and develop as a female college student was "pretty normal."  *Id.*  After the incident, however, Zepernick testified that A.S. is "hypervigilant" about not appearing weak or vulnerable – which has caused her to push her parents away.  [Doc. 29, pp. 27-28].  Additionally, the trauma causes A.S. to have difficulty sleeping, she wrestles with feelings of being unworthy, and she struggles with her faith.  [Doc. 29, pp. 19-21].  To successfully process both previous childhood trauma and the sexual assault at issue, Zepernick testified A.S. will need weekly therapy for eight to ten years.  [Doc. 29, p. 23].  Finally, Zepernick testified that if A.S. received additional counseling, it is "very possible" she could resume her master's education.  [Doc. 29, pp. 22-23, 31-32].  Zepernick also expressed optimism regarding A.S.'s future.  [Doc. 29, pp. 22-23, 31-32].

## IV.   LEGAL ANALYSIS

### A. *Default Judgment*

Under Federal Rule of Civil Procedure 55, the court has the authority to enter a default judgment against a defendant who makes no response to an action.  Fed. R. Civ. P. 55 (a)-(b).  Default judgments, however, are "generally disfavored" and are considered "a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations."  *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 272, 276 (5th Cir. 1989).  Accordingly, "a party is not entitled to a default judgment, even where the defendant is technically in default."  *Ganther v.*

*Ingle*, 75 F.3d 207, 212 (5th Cir. 1996).  Further, "proper service of process is a jurisdictional prerequisite to the entry of a default judgment."  *Avdeef v. Royal Bank of Scotland, P.L.C.*, 616 Fed. App'x 665, 672 (5th Cir. 2015) (citing *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 940 (5th Cir. 1999).  Therefore, as a threshold matter, the Court must examine the sufficiency of Plaintiffs' attempted service of process.

> B.  <u>Service of Process</u>

Because Plaintiffs filed their suit after the Defendant had absconded to France, Plaintiffs attempted to serve the Defendant through the Hague Convention.  The Court must therefore look to both the Federal Rules of Civil Procedure and the Convention to determine whether service was proper.[10]

The Hague Convention was adopted "to provide a simpler way to serve process abroad, [and] assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad.  *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988) (citations omitted).  The Convention applies to "all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad." 20 U.S.T. 362, T.I.A.S. 6638, Art. 1.  To ensure effective service, the Convention

---

[10]     Fed. R. Civ. P. 4(f)(1) states that an individual who is not located within the United States may be served "by any internationally agreed means of service that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents."  France and the United States are both parties to the Convention and thus service of process on a defendant in France is governed by the Convention.  *See Hague Service Convention*, Feb. 10, 1969, 20 U.S.T. 361, T.I.A.S. No. 6638.; Fed. R. Civ. P. 4(f)(1).

"requires each state to establish a Central Authority to receive requests for service of documents from other countries."[11]  20 U.S.T. 362, T.I.A.S. 6638, Art. 2.  The Central Authority then must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law.  20 U.S.T. 362, T.I.A.S. 6638, Art. 5.  Once a foreign state's Central Authority has completed service, it must provide the applicant with a Certificate explaining how, where, and when service was made, or why service did not occur.  20 U.S.T. 362, T.I.A.S. 6638, Art. 6.

The first paragraph of Article 15 of the Convention provides that a member state may enter a default judgment if service has been completed and the defendant fails to appear if: (i) "the document was served by a method prescribed by the internal law of the State addressed for the service of documents in domestic actions upon persons who are within its territory;" or (ii) "the document was actually delivered to the defendant or to his residence by another method provided for in the convention;" and "in either of these cases the service or the delivery was effected in sufficient time to enable the defendant to defend."  20 U.S.T. 362, T.I.A.S. 6638, Art. 15.

The second paragraph of Article 15 allows a member state to enter a default judgment *without* proof of service if: (i) "the document was transmitted by one of the methods provided for in this convention;" (ii) at least six months have passed since the documents were sent to the defendant; and (iii) "no certificate of *any kind* has

---

[11]     The Central Authority should "promptly inform the applicant" of any deficiencies and objections upon receipt and "specify its objections to the request."  20 U.S.T. 362, T.I.A.S. 6638, Art. 4.

been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed."[12]  *Id.* (emphasis added).

Here, Plaintiffs have neither alleged nor provided any evidence that the Defendant has been served "by a method prescribed by the internal law of [France]" or that the documents were "actually delivered to the defendant or to his residence by another method provided for by [the] Convention."  *Id.*   Rather, Plaintiffs argue they are entitled to a default judgment under the second paragraph of Article 15. [Doc. 46, p. 8].  Both in their sworn affidavit [Doc. 12-1, p. 4] filed with the Clerk of Court seeking entry of default, and in their Proposed Findings of Fact and Conclusions of Law [Doc. 46, p. 8] after the evidentiary hearing, counsel for Plaintiffs represented to the Court, "[p]ursuant to the [sic] art. 15 of the Hague Convention, if the central authority fails to provide a *certificate of service* within 6 months, the plaintiff may move for default judgment." *Id.*; [Doc. 12-1, p. 4] (emphasis added).  But this is clearly <u>not</u> what Article 15 of the Convention says.  On its face, Art. 15 applies only where "no certificate of *any kind* has been received," including both certificates of service and certificates of non-service.   20 U.S.T. 362, T.I.A.S. 6638, Art. 15 (emphasis added).

Though the Court need go no further than the plain language of the Convention, other courts have recognized both explicitly and implicitly that the phrase "certificates of any kind" includes certificates of non-service.  For example, in

---

[12]     If a default judgment is entered pursuant to Article 15, then Article 16 of the Convention provides certain due process protections for the person to be served.  *See* 20 U.S.T. 362, T.I.A.S. 6638, Art. 16.

*Diz v. Hellmann Intern. Forwarders, Inc.*, a Florida appellate court held that a plaintiff who received "a certificate [from] the government of Spain concerning the attempted service" was not entitled to a default judgment under the Convention because they could not meet the conditions of the second paragraph of Article 15. 611 So.2d 18, 19 (Fla. Dist. Ct. App. 1992). There, the court determined that because plaintiffs had received a certificate from the Spanish government "that there had been no service," "[it] must be considered a 'certificate of any kind' to that effect under subparagraph (c), with the result that no judgment could thereafter be entered." *Id.*[13]

Moreover, federal courts are consistent that plaintiffs only meet the requirements of the second paragraph of Article 15 if they do not receive any type of certificate from the foreign government's central authority. *See Vallourec Tubos do Brasil S.A. v. PDVSA Servs., Inc.*, No. CV 4:16-3698, 2018 WL 6928292 *2 (S.D. Tex. Dec. 10, 2018), *report and recommendation adopted*, No. CV 4:16-3698, 2019 WL 93387 (S.D. Tex. Jan. 3, 2019) (finding default appropriate where plaintiff transmitted documents to the Central Authority, more than six months had elapsed since Central Authority received the request for service of process, and plaintiff's process server sent three separate requests for updates on status of service and received no response from the central authority); *Kiss Nail Prod., Inc. v. Shenzhen*

---

[13]   The only case found by the Court reaching a different result was *Bork v. Tran Huong Quynh*, where the Middle District of Florida granted an entry of default under the second paragraph of Article 15 despite the fact that "an affidavit of non-service was received from the Central Authority stating that there was no recipient at the provided address." No. 219CV354FTM38MRM, 2020 WL 6828001, at *1 (M.D. Fla. June 8, 2020). But that court included no substantive analysis of why this result is not precluded by the plain language of Article 15.

*Jinri Elec. Appliance Co.*, No. CV185625PKCAYS, 2020 WL 4679631, *5 (E.D.N.Y. July 23, 2020), *report and recommendation adopted*, No. 18CV5625PKCAYS, 2020 WL 4676415 (E.D.N.Y. Aug. 12, 2020) (holding default judgment may be entered "[i]n light of Plaintiff's proper service to the Central Authority … pursuant to Article 15" and no certificate or response has been received from the Chinese Central Authority); *Sikhs for Justice v. Nah*, 893 F. Supp 2d 598, 626-27 (S.D.N.Y. 2012) (finding plaintiffs who transmitted documents to Central Authority and waited more than a year properly effectuated service in accordance with the Convention because the Central Authority 'failed to return a Certificate of Service … object to the request, state its refusal to comply or otherwise respond'") (citations omitted).[14]

Here, Plaintiffs received an "official certification" from France's Central Authority "in the [*exact*] form of the model annexed" in Article 6 of the Convention. [Doc. 12-2, p. 2]; *see also,* 20 U.S.T. 362, T.I.A.S. 6638, Art. 6.  The plain language of Article 15 authorizes the entry of default under Article 15 only if the Central Authority does not provide a certificate of *any kind* within six months.  Thus, despite properly transmitting the documents and waiting over six months, Plaintiffs are not

---

[14]    Other courts have held that entry of default may still be proper when plaintiffs receive a response from a foreign administrator, but not a *certificate.*  In *Marchauser v. Travelers Indem. Co.*, a district court in the Southern District of Florida held that plaintiffs were entitled to a default under Article 15 of the Convention despite the fact that they had "received a letter from an administrator in Israel."  145 F.R.D. 605, 609 (S.D. Fla. 1992). There, the court reasoned that the letter, which merely stated that the request for service abroad did not emanate from a proper source, was not a "certificate of any type."  *Id.*  The Court further noted that the letter was not a certificate under Article 15 because it was not issued by the Central Authority and did "not conform to the model certificate annexed to the Convention" in Article 6.  *See id.*  Thus, in finding that the letter was not a certificate, the court determined that the plaintiffs were entitled to a default pursuant to Article 15 of the Convention.

entitled to a default under the second paragraph of Article 15 of the Hague Convention.

C. *Time to Effectuate Service*

Generally, "'[i]f a defendant is not served within 90 days after the complaint is filed, the court … must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Fed. R. Civ. P. 4(m). This requirement, however, explicitly does not apply to service of individuals who are abroad. *Id.*; *Lozano v. Bosdet*, 693 F.3d 485, 488 (5th Cir. 2012). Rather, with respect to foreign defendants, the Fifth Circuit has adopted a "flexible due diligence standard to determine whether [a] delay [in service] should be excused." *Lozano v. Bosdet*, 693 F.3d 485, 488-89 (5th Cir. 2012) (quoting 1 Steven S. Gensler, *Federal Rules of Civil Procedure: Rules and Commentary* 60 (2012 ed.). This, however, does not mean that "unlimited time exists." *Id.* at 488 (citations omitted). "Because district courts need to be able to control their dockets, Rule 4(f) authorizes a without-prejudice dismissal when the court determines in its discretion that the plaintiff has not demonstrated reasonable diligence in attempting service." *Id.* at 489 (quotations and citations omitted). When applying the flexible approach to service of foreign defendants "[g]ood faith and reasonable dispatch are the proper yardsticks." *Id.*

Considering Plaintiffs filed their complaint over two years ago, the difficulties of serving process abroad, and the Court's interest in controlling its docket, the Court grants Plaintiffs an additional 90 days to properly effectuate service or otherwise demonstrate continued "reasonable diligence" in attempting service. Failure to

provide evidence of continued substantive efforts to effect service within this time period will result in dismissal of this action without prejudice.

## V.    Conclusion

For the reasons mentioned above, the Court finds that Plaintiffs have failed to properly effectuate service and are therefore not entitled to a Default Judgment.

Accordingly,

IT IS HEREBY ORDERED that Plaintiffs' Motion for Evidentiary Hearing and for Default Judgment [Doc. 14] is DENIED.

IT IS FURTHER ORDERED that the Clerk's Notice of Entry of Default [Doc. 13] is VACATED.

IT IS FURTHER ORDERED that Plaintiffs are granted 90 additional days to effect proper service or otherwise demonstrate continued reasonable diligence in attempting to serve the Defendant.  Absent any extension granted by the Court, this matter will thereafter be subject to dismissal without prejudice.

THUS, DONE AND SIGNED in Chambers on this 27th day of June 2023.

DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE