## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

**JANE DOE, ET AL**  **CIVIL DOCKET NO. 6:21-CV-00430**

**VERSUS**  **JUDGE DAVID C. JOSEPH**

**EDOUARD d'ESPALUNGUE d'ARROS**  **MAGISTRATE JUDGE CAROL B. WHITEHURST**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the Court is a MOTION FOR DEFAULT JUDGMENT AND RULE TO SHOW CAUSE HEARING (the "Motion") [Doc. 92] filed by Plaintiffs, Jane Doe (hereinafter "A.S."), and her parents, John Doe ("J.S.") and Mary Doe ("D.S.") (collectively, "Plaintiffs").[1]  Plaintiffs request that the Court enter a default judgment against Defendant Edouard d'Espalungue d'Arros ("Defendant" or "d'Espalungue") finding that he sexually assaulted A.S. in September of 2018 and award damages.  [Doc. 46].

The Court conducted a show cause hearing on January 19, 2024, at which the Defendant failed to appear, and the Court accepted evidence taken by the Court at an evidentiary hearing held on October 12-13, 2022.  From this evidence, the Court now renders its Findings of Fact and Conclusions of Law.  To the extent that any finding of fact included herein may be construed as a conclusion of law, the Court adopts it as such, and to the extent that any conclusion of law included herein

---

[1]     Plaintiffs assert that because A.S. is the victim of a sex offense, she is entitled to confidentiality of her identity pursuant to Article I, § 25 of the Louisiana Constitution, La. R.S. 46:1841, and La. R.S. 46:1844(W)(1)(a).  [Doc. 1, p. 2].  The Court will file the names of the Plaintiffs in a sealed appendix hereto.

constitutes a finding of fact, the Court adopts it as such. For the reasons discussed below, the MOTION FOR DEFAULT JUDGMENT [Doc. 92] is GRANTED.

## I. JURISDICTION AND VENUE

The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, as: (i) Plaintiffs are citizens of Louisiana; (ii) the Defendant is a citizen or subject of a foreign state (France) who is not lawfully admitted for permanent residence in the United States; and (iii) the amount in controversy exceeds $75,000 exclusive of interest and costs. Venue is proper because the assault occurred in the Western District of Louisiana, the Plaintiffs reside in Lafayette, Louisiana, and because the Defendant is a foreign national who may be sued in any judicial district. 28 U.S.C. § 1391(c)(3) (a defendant not resident in the United States may be sued in any judicial district).

## II. PROCEDURAL HISTORY

This matter arises out of a sexual assault that occurred on September 30, 2018, during a church retreat organized by the "Ragin' Cajun Catholics," the college ministry of Our Lady of Wisdom Catholic Church ("OLOW") at the University of Louisiana at Lafayette ("ULL"). [Doc. 46, p. 17]. The retreat was held at a Christian retreat center approximately an hour north of Lafayette in Rapides Parish, Louisiana. [Doc. 1, p. 4]. The Defendant was arrested that same night by the Rapides Parish Sheriff's Office ("RPSO") on a charge of sexual battery. [Doc. 12-1, p. 1]. After he was booked, Defendant posted a $25,000 bond and then returned to Baton Rouge where he was a graduate student at Louisiana State University ("LSU"). *Id.* After

further investigation, the RPSO again arrested the Defendant on October 4, 2018, in Baton Rouge – this time for second degree rape.[2]  *Id.*  The Defendant posted an additional $75,000 bond, surrendered his passport, and again returned to Baton Rouge.  [Doc. 12-1, p. 2].  On December 14, 2020, the Defendant flew home to France, having received permission from the state district court in Rapides Parish to reclaim his passport and return home for the Christmas holiday.  [Doc. 12-1, p. 2].  The Defendant never returned to the United States.[3]  [Doc. 12-1, p. 2].

On February 22, 2021, Plaintiffs filed a Complaint in this Court seeking to recover monetary damages for the sexual assault pursuant to La. Civ. Code art. 2315. [Doc. 1, p. 7].  Specifically, Plaintiffs seek: (i) special damages, compensatory damages, and punitive damages against Defendant; (ii) all costs and fees associated with this action; and (iii) a protective order against the Defendant.  [Doc. 1, p. 7];

---

[2]    The Defendant was not charged by the Rapides Parish District Attorney until February 23, 2021, when he was indicted by a Louisiana grand jury on a charge of third-degree rape.  [Doc. 46, p. 2].

[3]    It is well known that France does not extradite its citizens. However, after d'Espalungue was indicted, the state court issued a no-bond arrest warrant which is now outstanding.  *Id.*  Subsequently, a "red notice" international arrest warrant was filed with Interpol requesting that law enforcement arrest d'Espalungue should he attempt to travel outside of France.  *Id.*; *see About Red Notices*, INTERPOL, http://www.interpol.int/en/How-we-work/Notices/About-Red-Notices (last visited March 8, 2023).

d'Espalungue allegedly tried to return to the United States on January 8, 2021, but was purportedly prevented by a "U.S. Marshal" who informed him that his visa had been revoked. [Doc. 46, p. 11].  d'Espalungue claimed that he was unaware his visa had been revoked, though LSU revoked his student visa when he was suspended from that school.  [Doc. 46, p. 12].  Plaintiffs allege that this shows d'Espalungue "created an elaborate ruse that he was attempting to return to the United States to face criminal charges but that he was being barred *because he had been arrested*, not because he was trying to fly on a student visa he knew had been revoked."  [Doc. 46, p. 12].

[Doc. 45, p. 13].  Under Louisiana law, "[a] delictual action against a person for any act of sexual assault, as defined in La. R.S. 46:2184, is subject to a liberative prescription period of three years."  La. Civ. Code art. 3496.2; (La. R.S. 46:2184 defines sexual assault as "any nonconsensual sexual contact.").  Prescription begins to run "the day the injury or damage is sustained," which in this case, is September 30, 2018.  *Id.*  As such, this action was timely filed by Plaintiffs.

A.  ***Service of Process Under the Hague Convention***

This Court went to great lengths to ensure that service of process was lawfully effected by Plaintiffs.  Because the Plaintiffs filed their lawsuit after the Defendant absconded to France, Plaintiffs hired "Ancillary Legal Corporation" to translate and serve the Defendant in compliance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (hereinafter, the "Convention").

The Convention was adopted "to provide a simpler way to serve process abroad, [and] assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad.  *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988) (citations omitted).  The Convention applies to "all cases, in civil or commercial matters, where there is occasion to transmit a judicial or extrajudicial document for service abroad."  20 U.S.T. 362, T.I.A.S. 6638, Art. 1.  To ensure effective service, the Convention "requires each state to establish a Central Authority to receive requests for service of

documents from other countries."[4]  20 U.S.T. 362, T.I.A.S. 6638, Art. 2.  The Central Authority then must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law.  20 U.S.T. 362, T.I.A.S. 6638, Art. 5.

Once the Central Authority has completed service, it must complete a Certificate explaining how, where, and when service was made, or why service did not occur.  20 U.S.T. 362, T.I.A.S. 6638, Art. 6.  The completed Certificate is then returned to the applicant.  *Id.*  Under Article 15 of the Convention, once service is made on the prescribed Central Authority, even if no certificate of service or non-service is received, a member state may still enter a default judgment if: (i) "the document was transmitted by one of the methods provided for in this Convention;" (ii) at least six months have passed since the documents were sent to the defendant; and (iii) the plaintiff has made "every reasonable effort … to obtain [a Certificate] through the competent authorities of the State addressed."[5]  20 U.S.T. 362, T.I.A.S. 6638, Art. 15.

Here, Plaintiffs hired "Ancillary Legal Corporation" to translate and serve the Defendant in compliance with the Convention.  [Doc. 6-1, p. 2]  On July 22, 2021, the translated Complaint was delivered to France's Central Authority, the Ministry of

---

[4]     The Central Authority should "promptly inform the applicant" of any deficiencies and objections upon receipt and "specify its objections to the request."  20 U.S.T. 362, T.I.A.S. 6638, Art. 4.

[5]     If a default judgment is entered pursuant to Article 15, then Article 16 of the Convention provides certain due process protections for the person to be served.  *See* 20 U.S.T. 362, T.I.A.S. 6638, Art. 16.

Justice.  [Doc. 6-1, p. 2].  More than a year later, on February 28, 2022, the French Ministry of Justice issued an official certification, pursuant to Article 6 of the Convention, that service of process could not be made on the Defendant because the "[r]ecipient did not reply to the request of the Police to appear before them." [Doc. 12-1, p. 2]; *see* 20 U.S.T. 361, T.I.A.S. 6638, Art. 6.  Specifically, the Certification showed that police officials in France spoke with the Defendant and scheduled three separate meetings for the Defendant to come to the police station to receive service, but that he never appeared.[6]  [Doc. 46, pp. 7-8]; [Doc. 12-2, pp. 9-10, 12, 18]; [Doc. 16, p. 2].

On June 30, 2022, the Court held a status conference with Plaintiffs' counsel. [Doc. 11].  There, after a discussion and assurances from Plaintiffs' counsel that the requirements for service of process under the Convention had been met, it was determined that counsel for Plaintiffs would file a Motion for Entry of Default followed by a Motion for Default Judgment.  [Doc. 11].  The Court also ordered Plaintiffs' counsel to provide the Clerk of Court with all known mailing addresses and email addresses for the Defendant so that the Clerk could apprise him of orders of the Court and any scheduled hearing dates.  [Doc. 11].  On July 6, 2022, Plaintiffs' counsel submitted a sworn affidavit attesting to service and requesting that the Clerk enter default against the Defendant.  [Doc. 12-1].  The Clerk of Court entered a

---

[6]    According to the Certification, the police spoke to the Defendant twice by telephone including once on October 21, 2021.  *See* [Doc. 12-1, pp. 9-10, 12, 18]; [Doc. 45. p. 8].  Meetings for service of the documents were scheduled for October 26, 2021, November 28, 2021, and February 1, 2022.  *Id.*

default against Defendant that same day.  [Doc. 13].  On July 12, 2022, Plaintiffs filed a motion seeking a default judgment against the Defendant.  [Doc. 14].[7]

Because of the serious nature of the allegations against the Defendant and the fact that Plaintiffs' case is not for a sum certain, the Court instructed Plaintiffs that it would conduct a full evidentiary hearing on the Plaintiffs' first motion for default judgment in order for the Court to establish the truth of the allegations, make factual findings from the evidence, and determine the amount of any damages sustained by Plaintiffs.[8]  [Doc. 11].

The Court held an evidentiary hearing on October 12 - 13, 2022.  At the hearing, the Court took documentary and testimonial evidence from the Plaintiffs, including the testimony of A.S. and the witnesses called by her, including: (i) former

---

[7]      In accordance with the Court's direction, Plaintiffs also filed a MOTION FOR *EX PARTE* ORDER DIRECTING CLERK OF COURT TO MAIL COPIES OF DEFAULT AND ORDER SETTING EVIDENTIARY HEARING TO DEFENDANT VIA INTERNATIONAL REGISTERED MAIL.  [Doc. 16]. Plaintiffs included in their Motion two addresses in France "utilized by the Defendant within the last year."  [Doc. 16].  The Order to Serve was entered on July 18, 2022, by the Magistrate Judge, directing the Clerk of Court to mail copies of the documents to the Defendant.  [Doc. 17].  The Clerk mailed the documents the next day to both addresses provided by Plaintiffs via International Registered Mail.  [Doc. 18].  The envelope mailed to the first address attributed to Defendant was marked unclaimed and returned on September 26, 2022.  [Doc. 46, p. 10]; *see also* [Doc. 19] (envelope marked "Pli avisé et non réclamé").  The envelope mailed to the second address attributed to Defendant was marked unclaimed and returned on October 26, 2022.  [Doc. 46, p. 10]; *see also* [Doc. 25] (envelope marked "Pli avisé et non réclamé").  Additionally, Plaintiffs emailed copies of the pleadings to two email addresses known to have been used by Defendant, and to the email address of Pierre Hourcade, whom Plaintiffs believe is Defendant's attorney in Paris.  [Doc. 24-10, p. 24]; [Doc. 24-15, p. 31].  No responses have been received.

[8]      In cases where a plaintiff's claim is not for a sum certain, "the party must apply to the court for a default judgment.  Fed. R. Civ. P. 55(b)(2).  The court "may conduct hearings … when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence; or (D) investigate any other matter."  Fed. R. Civ. P. 55(b)(2).

Ragin' Cajun Catholics director Father Bryce Sibley ("Father Sibley"); (ii) a detective formerly assigned to the case, Detective Cainan Baker; (iii) her mother D.S.; (iv) her father J.S.; and (v) her spiritual advisor Shelia Zepernick. [Doc. 23]. At the close of the hearing the Court informed Plaintiffs that the matter would be taken under advisement and ordered Plaintiffs to submit proposed Findings of Fact and Conclusions of Law, which, after more than six months of delays and requested extensions, was finally submitted to the Court on April 21, 2023. [Doc. 46].

In preparing its Findings of Fact and Conclusions of Law following the evidentiary hearing, the Court determined that, despite their assurances to the contrary, Plaintiffs' counsel had failed to properly effect service on the Defendant.[9] Therefore, at that time, the Court denied the Plaintiffs' first motion for default

---

[9]      As explained in the Court's Memorandum Order dated June 27, 2023 [Doc. 56], Plaintiffs originally attested that they were entitled to a default judgment under the second paragraph of Article 15, [Doc. 46, p. 8], which allows a member state to enter a default judgment *without* proof of service if: (i) "the document was transmitted by one of the methods provided for in this Convention;" (ii) at least six months have passed since the documents were sent to the Defendant; and (iii) "no certificate of *any kind* has been received, even though every reasonable effort has been made to obtain it through the competent authorities of the State addressed."  Despite the clear language of the Convention, both in a sworn affidavit [Doc. 12-1, p. 4] filed with the Clerk of Court seeking entry of default, and in their Proposed Findings of Fact and Conclusions of Law [Doc. 46, p. 8] after the evidentiary hearing, counsel for Plaintiffs represented to the Court, "[p]ursuant to the [sic] art. 15 of the Hague Convention, if the central authority fails to provide a *certificate of service* within six months, the plaintiff may move for default judgment." *Id.*; [Doc. 12-1, p. 4] (emphasis added).

Finding that Plaintiffs had received an "official certification" from France's Central Authority "in the [*exact*] form of the model annexed" in Article 6 of the Convention. [Doc. 12-2, p. 2], and further finding that Article 15 of the Convention applies only where "no certificate of *any kind* has been received," including both certificates of service and certificates of non-service. 20 U.S.T. 362, T.I.A.S. 6638, Art. 15 (emphasis added), the Court concluded that Plaintiffs were not entitled to a default under the second paragraph of Article 15 of the Hague Convention.

judgment and vacated the Clerk of Court's Entry of Default [Doc. 56].  Plaintiffs were granted 90 additional days to effect proper service or otherwise demonstrate continued reasonable diligence in attempting to serve the Defendant.

## B.  *Service of Process Under FRCP 4(f)(3)*

After a series of filings by Plaintiffs seeking reconsideration and findings by the assigned Magistrate Judge, the Plaintiffs requested that undersigned enter an order finding: (i) that service of process was effected on Defendant on February 23, 2021, through his Louisiana attorney, J. Michael Small; (ii) that the Court enter a *nunc pro tunc* order declaring this service valid under Rule 4(f)(3) of the Federal Rules of Civil Procedure; and (iii) that this Court reinstate the Clerk's Notice of Entry of Default on July 6, 2022 and enter a judgment in favor of the Plaintiffs [Doc. 76].  The Court thereafter conducted an evidentiary hearing on October 13, 2023, for the purpose of taking evidence related to the facts and circumstances of Plaintiffs' alleged service of process on Mr. Small and his representation of the Defendant.  [Doc. 81].

Rule 4(f)(3) of the Federal Rules of Civil Procedure authorizes service on a foreign defendant by means other than the Hague Convention when it is: (a) a court ordered method; (b) not prohibited by international agreement; and is (c) reasonably calculated, under the circumstances, to notify the defendant of the case and afford them an opportunity to present objections.  Fed. R. Civ. P. 4(f)(3).  *See, e.g., Viahart, L.L.C. v. GangPeng*, 2022 WL 445161, at *3 (5th Cir. Feb. 14, 2022) ("Service on a foreign defendant is therefore proper when it is a court ordered method that is not prohibited by international agreement and is reasonably calculated, under the

circumstances, to notify the defendant of the case and afford them an opportunity to present objections.").  Importantly, the Fifth Circuit has not spoken on whether Rule 4(f)(3) requires plaintiffs to obtain court approval before attempting alternative service, or whether the Court may authorize a service method retroactively, i.e., *nunc pro tunc*.

After testimony from Mr. Small and argument from Plaintiffs, the Court found that the evidence established that the Defendant had actual notice of this lawsuit on February 24, 2021, through the service of the civil complaint on Mr. Small.  Although Mr. Small was not authorized to accept service on Defendant's behalf, the Court found that Plaintiffs had provided *de facto* notice of the lawsuit to the Defendant. Nevertheless, the Court declined to enter a *nunc pro tunc* order allowing the February 2021 service on Mr. Small to take retroactive effect, finding that, based on a plain reading of the text of Rule 4(f)(3) and fundamental concepts of procedural due process and personal jurisdiction, Rule 4(f)(3) requires that an alternative method of service must be prospectively authorized by the Court.

Notwithstanding the foregoing, the Court also noted that the Magistrate Judge had previously authorized service by email in an Order dated August 17, 2023 [Doc. 63] and had re-stated that authorization in an Order dated September 8, 2023 [Doc. 73].[10]  Finding that the Plaintiffs submitted an affidavit of service pursuant to the Magistrate Judge's email authorization to four known email addresses on September 8, 2023. [Doc. 74], the Court concluded that service was properly effected on

---

[10]     The record shows that neither the Magistrate Judge's August 17, 2023, Order nor the September 8, 2023, Order were appealed.  [Doc. 81].

Defendant on September 8, 2023.  The Court further ordered that if Defendant did not timely file an answer, the Plaintiffs were permitted to move for a Clerk's entry of default and thereafter re-file a motion for a default judgment under Rule 55(b). Finally, the Court ordered that, upon the filing of a renewed motion for entry of default, the Court would conduct a show cause hearing as to why the testimony and evidence previously taken at the Court's October 12-13, 2022, evidentiary hearing should not be considered by the Court in support of a default judgment.

On December 13, 2023, after Defendant failed to timely file an answer, Plaintiffs filed a REQUEST FOR ENTRY OF DEFAULT [Doc. 89], which the Clerk granted and entered on the same date [Doc. 90].  On December 29, 2023, the Plaintiffs filed the instant MOTION FOR DEFAULT JUDGMENT AND RULE TO SHOW CAUSE HEARING [Doc. 92].  A Show Cause hearing was conducted on January 19, 2024 [*See* Minutes, Doc. 96].  Having determined that service of process was properly effected on the Defendant, and considering the testimony adduced at the October 12-13, 2022, evidentiary hearing, as well as the argument of Plaintiffs' counsel at the show cause hearing on January 19, 2024, the Court now makes the following Findings of Fact and Conclusions of Law.

## III.  FINDINGS OF FACT

### A.  *The Sexual Assault*

On September 28, 2018, the Ragin' Cajun Catholics began their annual "Encounter Weekend" retreat.  [Doc. 46, p. 17].  A.S., then a 21-year-old senior at ULL, and Defendant, d'Espalungue, then a 28-year-old French graduate student at

LSU, both attended.  [Doc. 46, p. 17]; [Doc. 1, p. 4].  A.S. had been involved with Ragin'
Cajun Catholics since her freshman year at ULL.  [Doc. 28, p. 20]; [Doc. 28, pp. 107-
109].  Though she had attended previous Encounter Weekends, this was the first time
she planned to stay through the whole weekend.  *Id.*  d'Espalungue was invited to
attend the retreat by his then 18-year-old girlfriend, who was a freshman at ULL and
also a member of the Ragin' Cajun Catholics.  [Doc. 46, p. 4].

A.S. testified that she met d'Espalungue the first night of the retreat when she
briefly introduced herself to him.  [Doc. 28, p. 109].  Throughout the next day, A.S
and d'Espalungue continued to interact.  [Doc. 28, p. 109].  Among other interactions,
A.S invited d'Espalungue to go on a hike and taught him to Cajun dance.  *Id.*  A.S.
admitted that she was attracted to d'Espalungue.  [Doc. 28, p. 92].[11]

While sitting around a bonfire on Saturday night, A.S. and d'Espalungue began
to talk.  [Doc. 28, p. 112].  When a group of girls at the bonfire began to sing loudly,
d'Espalungue asked A.S. if she wanted to go for a walk so they could continue their
conversation away from the noise.  *Id.*  While walking, d'Espalungue began to ask
A.S questions related to the retreat and relationships.   [Doc. 28, p. 113].  They
continued to walk until d'Espalungue and A.S. reached the dock of a small lake.  They
sat on a bench of the dock and continued to discuss relationships.  [Doc. 28, p. 115].
At that point, A.S stated that d'Espalungue admitted he had feelings for her.  [Doc.

---

[11]     Detective Cainan Baker testified that A.S. has consistently maintained in her initial
interview and subsequent statements that she found d'Espalungue attractive and that she
liked him. [Doc. 28, p. 92]. Detective Cainan Baker further testified that excerpts from
d'Espalungue's journal indicated that d'Espalungue was aware that A.S. liked him.  [Doc. 28,
p. 88].

28, 115].  Then, in the middle of a sentence, d'Espalungue kissed A.S., and repeatedly emphasized that he "had" to kiss A.S. so she would know he was "serious about her." [Doc. 28, p. 115].  A.S. testified that she originally consented to the kiss, but after a few seconds, wanted to stop and pulled away.  *Id.*

But d'Espalungue did not stop.  Instead, A.S testified that although she pulled away and no longer responded to d'Espalungue's advances, he continued to kiss A.S. and started to aggressively put his hands on her.  [Doc. 28, p. 115].  d'Espalungue then began to put his hands down A.S.'s leggings and told her that it was "difficult for him to abstain from sex."  *Id.*  At the same time, A.S. was telling him to stop and saying, "I don't want to do this," and "we're going to get in trouble."  *Id.*  As A.S. continued to try and move d'Espalungue's hands, he straddled her and pinned her hands behind her head.  [Doc. 28, p. 116].  A.S. then made a conscious decision that she would try to escape so she could "get out and this [could] be over," but when she attempted to lift her head and escape, her hair was trapped between the bench and d'Espalungue' s arm.  [Doc. 28, pp. 116-17].  At this point, A.S. testified that she was afraid of what d'Espalungue would do to her if she attempted to fight back.  *Id.*

A.S. continued to try and escape d'Espalungue, and eventually succeeded by saying that she needed to leave to take medicine.  [Doc. 28, p. 117].  Once they got up and began to walk, however, d'Espalungue threw A.S. on the ground and pinned her hands above her head, all the while A.S. was repeatedly saying "no," and "stop," she was crying, and was noticeably shaking.  *Id.*  d'Espalungue then pulled down A.S.'s leggings, and forcibly penetrated her.  *Id.*  About a minute or two later, d'Espalungue

got up leaving A.S. on the ground with her leggings and underwear at her knees.  *Id.*
When A.S. stood up, she noticed a clear substance on the back of her leggings.  *Id.*
A.S. confronted d'Espalungue, who claimed that the substance wasn't his because he
did not ejaculate.  *Id.*

A.S. then made her way to the Activity Center.  [Doc. 28, pp. 119-120].  A.S.
testified that d'Espalungue followed her to the door though she repeatedly asked him
not to walk with her or go in.  [Doc. 28, pp. 119-120].  Once inside, A.S. made eye
contact with her friend, J.B., and the two of them went into the snack room where
A.S. immediately became hysterical, began to cry, and curled up into a ball.  [Doc. 28,
p. 120].  The Court found A.S.'s testimony to be credible and supported by the
available direct and circumstantial evidence.

According to Father Sibley's testimony, he received a call around 1:00 a.m. that
there was a student in the activity building in "hysterics."  [Doc. 28, p. 21].  Once he
arrived, he saw A.S. on the ground "almost in a fetal position in complete and utter
hysterics, screaming, yelling, and wailing back and forth."  [Doc. 28, p. 21].  When
A.S. calmed down enough to explain what had happened, Father Sibley called 911.
[Doc. 28, p. 21].

Corporal Clayton Webb and another Deputy Sheriff from the RPSO arrived
around 1:30 a.m. and interviewed A.S., who was able to recount to them the events
that had transpired.  [Doc. 28, p. 54].  Once the deputies had finished their initial
interview with A.S., Father Sibley led them to the cabin where d'Espalungue was
staying.  [Doc. 28, p. 29].  Detective Cainan Baker, the lead detective on the case,

testified that the body camera video from d'Espalungue's interview with the deputies demonstrated that he appeared evasive and tried to "dodge questions with technicalities," but that he eventually admitted to having sex with A.S. and claimed it was consensual because "she did not resist." [Doc. 28, p. 61].[12]  At this point, the responding deputies handcuffed d'Espalungue and brought him to the squad car. [Doc. 28, p. 29].

By the time the Sheriff's deputies had returned to the snack room after interviewing d'Espalungue, they had determined that conducting a rape kit on A.S. would not be beneficial to the investigation since d'Espalungue admitted to having sex with A.S.  *Id.*  The deputies did, however, collect the clothes A.S. was wearing and also took a tampon that A.S. removed from her body.[13]

After interviewing multiple witnesses and considering the available evidence, including the body camera video from A.S. and d'Espalungue on the night of the incident, the DNA test confirming that the substance on A.S.'s leggings was semen containing d'Espalungue's DNA, as well as messages from d'Espalungue's cell phone and an examination of his diary, Detective Baker concluded that d'Espalungue

---

[12]    Detective Baker further testified that a lab analysis of the substance on A.S.'s pants collected on the night of the incident was seminal fluid that matched Edouard's DNA. [Doc. 28, p. 62].

[13]     According to Detective Baker, it took approximately 15 minutes and the assistance of two other females to remove the tampon from A.S.  [Doc. 28, p. 57].  The tampon was then given to the deputies who put it in a sealed plastic bag.  *Id.*  According to Detective Baker, the tampon was not sent for testing in the lab because storing it in a sealed plastic bag destroyed any DNA evidentiary value.  *Id.*  He noted, however, that he considered the fact that the tampon had been pushed so far into Plaintiff's body that it took approximately 15 minutes to remove and required the assistance of the two Ragin' Cajun staff members, as evidence of non-consensual penetration.  [Doc. 28, pp. 84, 90].

sexually assaulted A.S.  [Doc. 28, pp. 87-90].  Detective Baker also noted that his conclusion was based on the fact that A.S.'s story did not change throughout numerous interviews and because he was unable to find a motive for her to fabricate her story or otherwise not tell the truth.  [Doc. 28, pp. 76-77].  Like Detective Baker, after hearing the testimony of A.S. and Father Sibley, reviewing the evidence, and conducting limited cross-examination of Plaintiffs' witnesses, the Court makes the specific finding by a preponderance of the evidence that d'Espalungue sexually assaulted A.S. in Rapides Parish, Louisiana, in the early morning hours of September 30, 2018.

### B.    *The Aftermath and Resulting Damages*

After the sexual assault, A.S. suffered severe mental trauma which impacted her personal life as well as her education.  [Doc. 28, pp. 140-43].  A.S. testified that she spent many months finding a new counselor because the one she had used before the sexual assault did not specialize in sexual assault.  [Doc. 28, pp. 140-41].  With a potential criminal case and upcoming presentation of her case by the district attorney to the Rapides Parish grand jury, A.S. was distracted in school.[14]  [Doc. 28, p. 142]. Despite encouragement from a professor to take a leave of absence, A.S. continued her final two semesters of her undergraduate education and received a bachelor's degree.  [Doc. 28, pp. 141-42].  During this time, A.S. also applied and was accepted into graduate school.  *Id.*  In April 2019, however, A.S. was admitted to a psychiatric

---

[14]    Plaintiff was asked to testify before the grand jury in the criminal case.  *See* [Doc. 28, p. 136].  Plaintiff originally prepared to testify before the grand jury in early 2020, but the case was re-scheduled several times before she finally testified.  *Id.*

unit where she was subsequently diagnosed with PTSD, anxiety, and depression. [Doc. 28, pp. 137-38].

A few months into her first semester of graduate school, A.S. filed a leave of absence for medical reasons noting that she was "under treatment for PTSD and general anxiety, after being sexually assaulted in September 2018, and was still undergoing legal proceedings."  [Doc. 28, p. 145].  At the evidentiary hearing, A.S. also revealed that she was sexually abused as a child by a family member who was only a couple of years older than her.  [Doc. 28, p. 150].  Because of her own experience, A.S. wanted to be a play therapist so she could help children process their trauma.[15]  [Doc. 28, pp. 150-151].  A.S. is currently employed as a dance and Pilates instructor and no longer believes that she can be successful as a play therapist.  [Doc. 28, p. 148].

Father Sibley, who first met A.S. when she was a freshman at ULL and served as her pastor and spiritual director during her four years at ULL, testified that the sexual assault had a clear and profound mental, emotional, and spiritual effect on A.S.  [Doc. 28, p. 34].  A.S.'s previously frequent attendance and involvement in the Ragin' Cajun Catholic events became "sporadic," and he noticed that she seemed to be experiencing depression, "spiritual darkness," and anger.  *Id.*  Though A.S. was less involved with the Ragin' Cajun Catholics, she still sought Father Sibley's

---

[15]    Registered Play Therapists work with children to process and overcome trauma through play.  *See* [Doc. 14-5, p. 4]; [Doc. 24-6, p. 21]; [Doc. 46, p. 34].

guidance and asked him to accompany her to numerous interviews with Detective Baker.  [Doc. 28, pp. 31-32, 38].

A.S.'s parents described her as a playful, loving child who did well in school and "never gave them any trouble."  [Doc. 28, pp. 165-166, 186].  Her parents testified that A.S., as well as their relationship with her, has changed drastically since the sexual assault.  A.S.'s parents feel as if their interactions are now brief and strained because they fear upsetting A.S.  [Doc. 28, p. 177].  J.S. testified that before the assault he and A.S. went to church together and attended mission trips together, but their interactions are now infrequent and awkward.  [Doc. 28, pp. 189-190].  A.S.'s mother presented a medical expense summary of A.S.'s appointments, treatments, and hospitalization totaling $24,687.42.  [Doc. 28, p. 181]; [Doc. 24-5].[16]

A.S.'s two licensed professional counselors and her certified spiritual director also testified at the hearing.  All three agree that A.S. was particularly mentally and emotionally vulnerable because of unresolved childhood trauma.  They also each agreed that the consequences of the September 2018 sexual assault persist to this day.  [Doc. 46, p. 39].  They testified that it would take between five and ten years of therapy for A.S. to fully process her sexual assault.  [Doc. 46, pp. 42, 44, 46].

In her declaration, Elizabeth Baumer, a certified EMDR therapist, who saw A.S. fifty-six times between November 2018 and September 2020, diagnosed A.S. with

---

[16]    This amount does not include fifty-six sessions with Elizabeth Baumer, a Licensed Professional Counselor with a specialty certification in Eye Movement Desensitization Reprocessing Therapy ("EMDR"), which totals $8,400.  [Doc. 24-5, pp. 1, 4-5].

chronic PTSD, depression, and anxiety.[17]  [Doc. 24-5].  Baumer believes A.S. can only fully heal if she returns to EMDR therapy, which she believes may take eight to ten years.  *Id.*; [Doc. 46, p. 44].  Additionally, Marielle Babb, a Licensed Professional Counselor who has treated A.S. since March 2021, testified that as of September 2022, she believes A.S. meets the criteria for PTSD.  [Doc. 29, pp. 14-15].  Her primary PTSD symptoms are avoidance, involuntary outbursts, and anger.  Additionally, A.S. still wrestles with feelings of shame and struggles to sleep.  [Doc. 46, p. 40].  According to Babb, all of these symptoms are typical for victims of sexual assault.  [Doc. 46, p. 43]; *see also* [Doc. 24-17].  Babb testified that she believes the sexual assault has negatively impacted A.S.'s ability to become a Licensed Professional Counselor.  [Doc. 46, p. 45]; *see also* [Doc. 24-17].

Sheila Zepernick ("Zepernick"), a cognitive behavioral therapist, EMDR certified therapist, and a Certified Spiritual Director, saw A.S. approximately twelve times as a counselor during her first two years of college in 2016 and 2017.  [Doc. 29, p. 11].  At the request of Father Sibley, Zepernick began seeing A.S. as a spiritual director and companion after the incident and continues to see her.  [Doc. 29, p. 10]. Zepernick testified that during their early sessions in 2016 and 2017, A.S. was emotionally stable and, though they discussed A.S.'s childhood sexual assault, Zepernick concluded that A.S.'s ability to function and develop as a female college student was "pretty normal."  *Id.*  After the incident, however, Zepernick believes that A.S.'s unresolved childhood sexual assault left A.S. particularly vulnerable and at a

---

[17]    EMDR therapy is a therapy for the treatment of PTSD which forces victims to "reprocess all layers of trauma in their life."  [Doc. 24-5, p. 3].

higher risk of being traumatized when she was sexually assaulted by d'Espalungue. [Doc. 29, p. 14].  As a result, she believes A.S. is "hypervigilant" about not appearing weak or vulnerable – which has caused her to push her parents away.  [Doc. 29, pp. 27-28].  Additionally, the trauma causes A.S. to have difficulty sleeping, she wrestles with feelings of being unworthy, and struggles with her faith.  [Doc. 29, pp. 19-21].  To successfully process both the childhood sexual assault, and the sexual assault at issue here, Zepernick testified A.S. will need weekly EMDR therapy for eight to ten years. [Doc. 29, pp. 23].  Finally, Zepernick testified that if A.S. received additional counseling, that it is "very possible" she could resume her master's education.  [Doc. 29, pp. 22-23, 31-32].  Zepernick also expressed optimism regarding A.S.'s future and noted that nothing is truly foreclosed to her.  [Doc. 29, pp. 22-23, 31-32].

In addition to testimony, Plaintiffs introduced the declaration of Forensic Accounting Expert, John W. Theriot ("Theriot") into evidence.  [Doc. 24-9].  At the request of Plaintiffs' counsel, Theriot calculated A.S.'s past and future wage loss as well as her future medical expenses.[18]  [Doc. 24-9, p. 2].  Assuming A.S. earned her master's degree in professional counseling in December 2021, as originally planned, A.S. would have earned between $40,000 and $45,000 as an entry-level counselor in January 2022.  [Doc. 24-9, pp. 1-3].  Theriot used a midpoint of $42,500 and subtracted A.S.'s actual average monthly earnings between her anticipated date of

---

[18]    Theriot also relied on the Declaration of Irvin G. Esters, a professor, and the Department Head of Counselor Education at ULL.  [Doc. 24-9]; [Doc. 24-6].  In his Declaration, Esters provided an estimated ranges of annual income for an entry level professional counselor, play therapist, and specialty practice professional counselor and play therapist.  [Doc. 24-6, p. 3]; [Doc. 24-9, p. 2].

becoming a Licensed Professional Counselor ("LPC") and the date of the hearing and determined that A.S. has suffered a net loss of $3,040 in wages. [Doc. 24-9, p. 6]; [Doc. 46, p. 54]. Next, based on A.S.'s estimated work life of 35.52 years as an LPC, as well as a Certified Play Therapist after eight years, Theriot concluded that the diminished value of A.S.'s future earning capacity is $2,014,350. [Doc. 24-9, pp. 2-3, 6]. Finally, Theriot determined that A.S.'s therapy and medical expenses for five years would cost $40,416. [Doc. 24-9, pp. 3-4].

## IV.   CONCLUSIONS OF LAW

### A.   *Default Judgment*

Under Federal Rule of Civil Procedure 55, the court has the authority to enter a default judgment against a defendant who makes no response to an action. Fed. R. Civ. P. 55(a)-(b). The clerk must enter a party's default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). Once there has been an entry of default, upon motion of the plaintiff, the court may enter a default judgment. Fed. R. Civ. P. 55(b)(2). However, default judgments are "generally disfavored" and are considered "a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead & Sav. Ass'n*, 874 F.2d 272, 276 (5th Cir. 1989). Accordingly, "a party is not entitled to a default judgment, even where the defendant is technically in default." *Ganther v. Ingle*, 75 F.3d 207, 212 (5th Cir. 1996).

Rather, a district court must first determine whether the entry of default judgment is appropriate under the circumstances. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). Relevant factors include: (i) "whether there are material issues of fact;" (ii) "whether there has been substantial prejudice;" (iii) "whether the grounds for default have been clearly established;" (iv) whether the default was caused by excusable neglect or good faith mistake; (v) "the harshness of the default judgment;" and (vi) "whether the court would think itself obliged to set aside the default on a motion by defendant." *Id.* Second, the court must assess the relative merits of a plaintiff's claims and determine whether they are entitled to relief. *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975).

Here, the Court finds that default judgment is appropriate under the circumstances and that Plaintiffs have stated viable claims for relief. First, Defendant's failure to accept service or answer the complaint has resulted in the absence of any disputed material fact as a matter of law. *Lindsey*, 161 F.3d at 893; *Nishimatsu Constr.*, 515 F.2d at 1206 (noting that "[t]he defendant, by his default, admits the plaintiff's well-pleaded allegations of fact"). Second, Defendant's failure to respond has brought a halt to the adversarial process in this case that was filed almost three years ago, thereby prejudicing the Plaintiffs. Third, the grounds for default are "clearly established." Plaintiffs properly effectuated service under Fed. R. Civ. P. 4(f)(3) and d'Espalungue has failed to plead or otherwise defend the claims against him. Plaintiffs appropriately and timely moved for entry of default, which was entered by the Clerk of Court on December 13, 2023, pursuant to Federal Rule

of Civil Procedure 55. *See supra* p. 6. d'Espalungue has not responded to the entry of default. Fourth, there is no evidence to indicate that d'Espalungue's silence is the result of "good faith mistake or excusable neglect." Rather, d'Espalungue's failure to appear to accept service in France despite two telephone conversations and three scheduled meetings with French authorities indicates the opposite. Fifth, d'Espalungue's failure to file a sufficient answer or otherwise defend the present lawsuit for three years – despite the Court's finding that Defendant is very well aware of this proceeding against him – mitigates the harshness of the default judgment. Finally, this Court is currently unaware of any facts that may provide "good cause" to later set aside the default judgment if challenged by d'Espalungue.

Considering all things, the Court finds that Plaintiffs have stated viable claims for relief supported by a strong basis in fact. The Court therefore finds d'Espalungue liable for damages resulting from his sexual assault of A.S.[19]

## B. *Damages*

The final step in the default judgment analysis is the determination of what relief, if any, Plaintiffs should receive. Here, Plaintiffs seek: (i) $2,145,005.29 in special damages and $3,200,000 in general damages for A.S.; (ii) $500,000 in loss of consortium damages for J.S. and D.S.; and (iii) $16,500,000 in exemplary damages

---

[19]    As noted earlier, in a delictual action for sexual assault, sexual assault "means any nonconsensual sexual contact including but not limited to any act provided in R.S. 15:541(24) or obscenity (R.S. 14:106)." La. R.S. 46:2184. La. R.S. 15:541(24)(a) defines "sex offense" to include: first degree rape, forcible second degree rape, simple or third degree rape, sexual battery, and second degree sexual battery, among others.

for all Plaintiffs.[20]   Ultimately, however, the "trial court has wide discretion in awarding damages." *Wheat v. United States*, 860 F.2d 1256, 1259 (5th Cir. 1988).

### i.  *Special and General Damages*

First, Plaintiffs seek $35,103.86 for A.S.'s current student loan balance for her undergraduate and graduate education.  [Doc. 46, p. 63].  Plaintiffs contend that A.S. is entitled to the full amount of her student loan balance because she obtained her undergraduate degree in psychology "for the sole purpose of becoming a Licensed Professional Counselor and Certified Play Therapist … which is no longer of commercial value to her."  [Doc. 46, p. 54].  A.S. testified that, after the sexual assault, she continued her final two semesters of her undergraduate education and was able

---

[20]      Plaintiffs' assert that they are entitled to exemplary damages because A.S. was a "dating partner" of d'Espalungue.  [Doc. 46, p. 2].  According to Plaintiffs, A.S. qualifies as a "dating partner" under La. R.S. 46:2151(B) because there was an "expectation of intimate involvement" due to d'Espalungue's assurances that he was interested in A.S. and that he was "serious" about her.  [Doc. 46, pp. 60-61].  The Court disagrees.  La. R.S. 46:2151(B) defines dating partner as "any person who is involved or has been involved in a sexual or intimate relationship with the offender characterized by the expectation of affection involvement independent of financial considerations … '[d]ating partner' shall not include a casual relationship or ordinary association between persons."  At the time of the sexual assault, A.S.'s relationship with d'Espalungue was casual.  They had known each other for approximately thirty hours — as Plaintiffs concede — and they were not "involved," nor had they been previously involved in a "sexual or intimate relationship."  The Court therefore does not find that d'Espalungue's "assurances" to A.S. are sufficient to qualify A.S. as a dating partner under the statute.

Even assuming A.S. and d'Espalungue are properly considered "dating partners," La. Civ. Code art. 2315.8 only provides that, "exemplary damages may be awarded upon proof that the injuries on which the action is based were caused by a wanton and reckless disregard for the rights and safety of a *family or household member*, as defined in R.S. 46:2132." (Emphasis added).  La. R. S. 46:2132, however, contains separate definitions for "family members," "household members," and "dating partners" – and neither the definitions of "family members" nor "household members" are inclusive of "dating partners."  Further, though the legislature amended 2315.8 in 2018 (after the definition of "dating partner" had been added to La. R. S. 46: 2132 in 2015), it did not add "dating partners" as a category of persons entitled to exemplary damages under 2315.8.  Thus, neither A.S. nor her parents are entitled to exemplary damages under Louisiana law.

to graduate.  Once A.S. started graduate school, however, the pressures of graduate level classes combined with PTSD and general anxiety she suffered as a result of the sexual assault became too much and she requested a medical leave of absence from her graduate program.  Here, because A.S. obtained her undergraduate degree, completed six of eight semesters before the sexual assault, and in consideration of the inherent value of having obtained a bachelor's degree, the Court finds that A.S. is not entitled to recover damages related to her undergraduate expenses.  However, the evidence clearly shows that A.S. was unable to successfully pursue and complete her master's degree as a result of the sexual assault, and therefore is entitled to the $10,250 in student loans that A.S. incurred for her graduate education, plus interest of $358.22.

Next, A.S. seeks $31,887.42 for past medical expenses and $60,624 in future medical expenses.  [Doc. 46, p. 64].  Plaintiffs submitted records of medical invoices and expenses incurred between September 30, 2018, and October 12, 2022.  [Doc. 24-20].  The Court finds by a preponderance of the evidence that A.S. incurred the expenses as a result of Defendant's sexual assault.  A.S. is therefore entitled to $31,887.42 in past medical expenses.  Similarly, based on the testimony of Baumer, Babb, and Zepernick, the Court agrees that A.S. will require additional therapy to fully recover from the sexual assault by d'Espalungue — as well as the sexual abuse she suffered as a child.  Thus, A.S. is entitled to $60,624 in future medical expenses.

Additionally, A.S. presented evidence that had she completed a master's degree in counseling education in December 2021, she would have become an entry-level

LPC in January 2022 earning between $40,000 and $45,000 a year.  [Doc. 24-9, pp. 1-3].  Because Plaintiff did not obtain her master's degree, Plaintiffs' forensic accounting expert determined that A.S. has suffered a net loss of $3,040 in past wages between the period of her anticipated date of becoming an LPC and the date of the Hearing.  [Doc. 24-9, p. 6]; [Doc. 46, p. 54].  The Court finds that, but for the sexual assault, A.S. would likely have successfully become an LPC in January 2022 and is therefore entitled to $3,040 for past wage loss.

Finally, A.S. seeks $2,014,350 for loss of future income, and $3,200,000 in general damages.  [Doc. 46, p. 64].  A.S. presented evidence that she will require somewhere between five and ten years of EMDR therapy to fully process her trauma. [Doc. 46, pp. 42, 44, 46].  Additionally, Theriot calculated her anticipated earnings as an LPC for the balance of her work life and determined that the present value of her diminished earning capacity is $2,014,350.  [Doc. 24-9, pp. 2-3, 6].  However, "[a]wards of loss of future income are inherently speculative and are intrinsically insusceptible of being calculated with mathematical certainty."  *Whitaker v. Mullinax*, 628 So.2d 222, 229 (La. Cir. 2nd App. 12/3/1993).  Loss of future income awards, therefore, "must be proved with a reasonable degree of certainty; purely conjectural or uncertain future lost earnings will not be allowed."  *Simpson v. U V Ins. Risk Retention Grp, Inc.,* 304 So.3d, 1002, 1015 (La. App. 3 Cir. 9/30/20) (citations omitted); s*ee Lee v. Louisiana Bd. of Trustees for State Colleges*, 275 So.3d 287, 296-97 (La. App. Cir. 3/13/19) *writ denied*, 291 So.3d 690 (La. 1/14/20) (holding loss of future earnings award for plaintiff who had just started college when he was injured

was too speculative and uncertain in part because "his career or professional path had not yet been decided").  Due to the speculative nature of awards of loss of future income, A.S.'s young age, potential earning capacity, lack of any physical limitations, and the optimism about her future expressed by both A.S. and Zepernick at the hearing, the Court finds that any loss of future earnings that may be sustained by A.S. are uncertain and speculative.  The Court, therefore, does not award A.S. any damages for loss of future income.

General damages in the case of sexual assault are very difficult to determine. Courts and juries in Louisiana and around the country have struggled with how to quantify the physical and emotional trauma, mental anguish, and psychological effects that sexual assault has on the victim.  *E.g. Johnson v. Holiday*, No. CV 15-38-JWD-RLB, 2021 WL 260665 (M.D. La. Jan. 26, 2021), *aff'd*, No. 21-30108 2022 WL 622323 (5th Cir. Mar. 3, 2022) (holding jury verdict of $500,000 in compensatory damages for plaintiff that was raped twice and suffered from PTSD was not excessive); *Doe v. Neal*, No. SA-14-CA-102-XR, 2015 WL 3688259 (W.D. Tex. June 12, 2015) (awarding plaintiff who was sexually assaulted by a police officer $750,000 in compensatory damages in default judgment); *Tubby v. Allen*, No. 6:16CV972, 2019 WL 4565072 (E.D. Tex. Sept. 3, 2019), *report and recommendation* adopted, No. 6:16-CV-972-JDK-KNM, 2019 WL 4538028 (E.D. Tex. Sept. 19, 2019) (finding plaintiff who was raped by police officer in custody and suffered physical and psychological injuries was entitled to $300,000 in compensatory damages); *Lewis v. Pugh*, 289 F. App'x 767, 776-77 (5th Cir. 2008) (finding $50,000 compensatory damage award to

plaintiff who was raped and subsequently assaulted did not "shock the judicial conscience").  However, in a civil suit such as this one, monetary damages are the only recourse and must be quantified.  Here, there is no doubt of the impact this singular event has had on A.S. and her family.  The Court recalls vividly the testimony at the evidentiary hearing and has no doubt of the damage caused by Defendant's actions.  The Court therefore finds that A.S. is entitled to a substantial general damages award.

In determining quantum, however, the Court also remains cognizant that this is a unique situation in which the Court is obliged to determine its general damages award based only on evidence taken at an *ex parte* hearing.  Accordingly, all things having been considered, and having reviewed monetary awards in sexual assault cases by juries and courts throughout Louisiana and the region, the Court awards A.S. an amount of $500,000 in general damages.

### ii. Loss of Consortium Damages

D.S. and J.S. seek damages for loss of consortium under La. Civ. Code art. 2315(B).  Loss of consortium damages are "recoverable by the same respective categories of persons who would have had a cause of action for wrongful death of an injured person."  La. Civ. Code art. 2315(B).  "[A]n award for loss of consortium is properly made where there has been some measurable or compensable loss, such as loss of love and affection, society and companionship, right of performance of material services, right of support, aid and assistance, and felicity."  *Harper v. State ex rel. Its Dept. of Health and Hospitals*, 176 So.3d 479, 492-93 (La. App. 4 Cir. 9/9/15)

(quotations and citations omitted).  Plaintiffs J.S. and D.S. testified regarding the strain in their relationship with their daughter because of an "elephant in the room." [Doc. 28, pp. 174-74].  Additionally, J.S. and D.S. testified about the frustration at their inability to comfort and help their daughter recover and that they worry about their daughter's future and ability to maintain relationships because of the assault. Accordingly, the Court finds that Plaintiffs J.S and D.S. proved they have suffered a measurable and compensable loss.  All things considered, and having reviewed awards granted by Courts and juries in Louisiana, the Court has determined that J.S and D.S. are entitled to $50,000 each in loss of consortium damages.

### CONCLUSION

Accordingly, based on the pleadings, testimony, and evidence presented, the Court finds that Default Judgment is proper.

IT IS HEREBY ORDERED that Plaintiffs' MOTION FOR DEFAULT JUDGMENT [Doc. 92] is GRANTED.

It is FURTHER ORDERED that Plaintiff A.S. be awarded a sum of $606,204.64.

It is FURTHER ORDERED that Plaintiffs J.S. and D.S. each be awarded a sum of $50,000 in loss of consortium damages.

It is FURTHER ORDERED that Defendant Edouard d'Espalungue d'Arros shall have no contact or attempt to contact or be in physical proximity of Plaintiff A.S. without leave of this Court.

IT IS FURTHER ORDERED that this Order shall remain enforceable indefinitely unless revoked.

THUS, DONE AND SIGNED in Chambers on this 19th day of January 2024.

_____
DAVID C. JOSEPH
UNITED STATES DISTRICT JUDGE